**[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 158.]**

THE STATE EX REL. CHRYSLER CORPORATION, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO; GARRETT, APPELLANT.

[Cite as *State ex rel. Chrysler Corp. v. Indus. Comm.*, 1998-Ohio-460.]

*Workers' compensation—Industrial Commission's award of temporary total disability compensation and medical benefits supported by "some evidence," when—Employer not entitled to reimbursement from Surplus Fund under former R.C. 4123.515, when.*

(No. 95-561—Submitted August 26, 1997—Decided February 25, 1998.)

APPEAL from the Court of Appeals for Franklin County, No. 93APD12-1717.

———————————

{¶ 1} Alford Garrett, appellant, seeks reversal of the Franklin County Court of Appeals judgment that granted Chrysler Corporation, appellee, a writ of mandamus to vacate Garrett's award of temporary total disability compensation ("TTD") and medical benefits.

{¶ 2} Garrett injured his knees on December 21, 1985 while working for Chrysler's predecessor, Jeep Corporation. Chrysler, a self-insured employer, initially certified Garrett's workers' compensation claim for "left knee." Pursuant to this allowance, Garrett began receiving TTD in February 1986.

{¶ 3} In June 1987, Chrysler moved to terminate Garrett's TTD on the basis that his condition had become permanent. In August 1987, a district hearing officer ("DHO") for the Industrial Commission of Ohio ordered TTD to continue based on the submission of supporting medical reports, with the permanency issue to be reassessed later. In November 1987, a DHO granted additional allowances for "contusion right knee" and "chondromalacia left patella." The DHO again continued TTD with permanency to be reassessed later.

**{¶ 4}** On May 17, 1988, a DHO recognized as compensable Garrett's additional condition of "aggravation of pre-existing bilateral pat[]ellofemoral arthritis," but declared that Garrett's condition had become permanent. On the same day, Garrett applied for permanent total disability compensation ("PTD"), and the DHO ordered TTD to continue pending disposition of that application.[1] Chrysler administratively appealed allowance of the new condition without success.

**{¶ 5}** Chrysler timely challenged the allowance in the Lucas County Common Pleas Court. On August 6, 1990, the common pleas court found, based on a jury verdict, that Garrett could not participate in the State Insurance Fund for the aggravated arthritic condition. Chrysler stopped paying Garrett TTD as of that judgment. But in September 1991, the Lucas County Court of Appeals reversed. It held that the common pleas court had erroneously denied Garrett's motion for summary judgment and that, as a matter of law, Chrysler had conceded compensability of Garrett's claim by having certified and paid his 1987 medical expenses based on a "bilateral patellofemoral osteoarthritis" diagnosis. *Garrett v. Jeep Corp.* (1991), 77 Ohio App.3d 402, 602 N.E.2d 691. Chrysler did not appeal.

**{¶ 6}** Pursuant to the court of appeals' judgment, the commission formally recognized Garrett's claim for "aggravation of pre-existing bilateral pat[]ellofemoral arthritis" in April 1992. Based on this order, Garrett's 1988 motion for PTD, and a February 3, 1992 C-86 motion for continued TTD and authorization for "total replacement of the knee," a DHO scheduled the cause for hearing on the *Eaton* docket. After a January 1993 hearing, a DHO ordered Chrysler to make up TTD payments stopped after the common pleas ruling and to

---

1. This commission practice was later invalidated in *State ex rel. Eaton Corp. v. Lancaster* (1988), 40 Ohio St.3d 404, 534 N.E.2d 46, reconsidered and modified on other grounds (1989), 44 Ohio St.3d 106, 541 N.E.2d 64, because it continued TTD despite the claimant's ineligibility due to permanency/maximum medical improvement.

continue TTD based on submission of medical evidence. The DHO also determined that Garrett's disability, "based upon all the allowed conditions [of left knee, contusion right knee, chondromalacia left patella, and aggravation of pre-existing bilateral patellofemoral arthritis], ha[d] not yet reached maximum medical recovery," and he authorized surgery to replace Garrett's right knee. The DHO's order was based on "the medical reports of Dr(s), [Robert] Kalb, [Howard] Rosenblatt & [S.S.] Purewal * * * the claimant's application, evidence in the file and/or evidence adduced at the hearing." Chrysler appealed administratively, but the commission did not disturb the DHO's order.

{¶ 7} In February 1993, Garrett dismissed his May 17, 1988 application for PTD.

{¶ 8} Chrysler then requested the instant writ in the court of appeals, arguing that (1) no evidence established that Garrett's arthritis, as aggravated by his 1985 industrial injury, caused his disability and need for medical treatment after 1990, (2) an allowed aggravation of a pre-existing condition does not include disability attributable to a pre-existing condition, (3) the commission's May 17, 1988 permanency determination precluded restoration of TTD, and (4) the commission failed to adequately explain its award of TTD and medical benefits. A referee recommended granting the writ based on Chrysler's first and second argument, without reaching the third and fourth. The referee found, based on the deposition testimony of Dr. Kalb, Garrett's attending orthopedic surgeon, that Garrett's condition "[was] no worse because of the industrial injury" and, thus, that no evidence established the required causal connection. The court of appeals overruled objections, adopted the referee's report, and granted the writ of mandamus, but on the ground that Dr. Kalb's report was too equivocal to constitute "some evidence" for the commission's award of TTD and medical benefits.

{¶ 9} The cause is before this court upon an appeal as of right.

———————————

*Eastman & Smith, Thomas J. Gibney* and *Ricardo A. King*, for appellee.

*Dorothy McCrory & Assoc., Paula Hicks-Hudson* and *Christopher S. Clark*, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 10} This cause presents five issues for our review: (1) Is Dr. Kalb's opinion "some evidence" for the award of TTD and medical benefits? (2) Was Garrett required to prove that the aggravation of his arthritic condition caused his disability and need for medical benefits? (3) Did the commission's confirmation of the DHO's May 17, 1988 finding that Garrett's condition was permanent preclude the commission's continuation of TTD? (4) Did the commission sufficiently explain its reasoning? and (5) Assuming reversal of the writ vacating Garrett's award, is Chrysler entitled to reimbursement from the Surplus Fund under former R.C. 4123.515 due to the commission's failure to appeal? For the reasons that follow, we hold that (1) Dr. Kalb's reports are some evidence to support the commission's decision; (2) Garrett was required to and did provide evidence to establish a causal connection between his injury and disability; (3) the commission complied with *State ex rel. Eaton Corp.* v. *Lancaster* (1988), 40 Ohio St.3d 404, 534 N.E.2d 46, such that the commission's permanency determination did not preclude subsequent TTD; (4) the commission's explanation was adequate under *State ex rel. Mitchell v. Robbins & Myers, Inc*. (1983), 6 Ohio St.3d 481, 6 OBR 531, 453 N.E.2d 721; and (5) Chrysler is not entitled to reimbursement from the Surplus Fund. Accordingly, we reverse.

*Some Evidence and Causation*

**{¶ 11}** To receive workers' compensation for conditions developing after an industrial injury, the claimant must show "not only that his injury arose out of and in the course of his employment, but that a direct and proximate causal relationship existed between his accidental injury and his harm or disability." *Fox v. Indus. Comm.* (1955), 162 Ohio St. 569, 576, 55 O.O. 472, 475, 125 N.E.2d 1, 5.

**{¶ 12}** The commission relied on the reports of Dr. Kalb and Drs. Purewal and Rosenblatt, both commission specialists, to grant Garrett TTD and authorize surgery. Neither the Purewal nor Rosenblatt reports, however, recognized the aggravation of Garrett's arthritic condition as allowed by the commission. Thus, the court of appeals correctly concluded that neither report is evidence tying Garrett's injury to his arthritic disability.

**{¶ 13}** In April 1988, Dr. Kalb reported:

"In summary, it is my opinion [Garrett's] pre-existing patellofemoral arthritis condition was aggravated by his work-related injury * * *. It is also my opinion at the present time that he has reached maximum medical improvement unless further treatment is carried out. This treatment would consist of patellectomy or knee arthroplasty and would be expected to improve his condition and function and possibly allow return to work. His work restrictions after such a procedure, however[,] would involve limitations to avoid frequent knee flexion beyond 90 degrees. This would include restrictions on frequent squatting, stair climbing and ladder climbing activities.

"With his age, muscle strength, and weight, knee arthroplasty would be expected to provide a more favorable lasting result than patellectomy. In direct answer to your question regarding his initial complaints, his symptoms were present on both sides subsequent to his injury. His impairment would be based upon his limitation of knee ROM according to the AMA guidelines for impairment."

{¶ 14} In January 1991, Dr. Kalb recommended replacement of Garrett's knee and offered this report, apparently to redress inconsistency in two depositions he had provided in February 1990 for the common pleas court proceedings:

"As I mentioned in my deposition, it is unusual that an injury such as that sustained by Mr. Garrett would be expected to produce abrupt, continuous and progressive symptoms of pain within the knee. My opinion regarding the accident resulting in substantial aggravation to his knee condition is based as I mentioned on Mr. Garrett's history of not having had any problems with his knees of any sort, nor any requirement for medical treatment for his knees prior to the accident * * *.

"* * *

"In summary, as I mentioned in my deposition, one would not expect an injury from the side to aggravate or contribute to his patellofemoral arthritic knee condition. However, one must not ignore the patient's history of having no pain prior to the accident with his knees and having had no medical treatment prior to the accident with his knees. Based upon his history * * * of having [the] onset of symptoms which have become progressive subsequent to the accident[,] [it] is logical to conclude that for whatever reason, his pain did develop immediately subsequent to the accident and therefore it is logical to conclude that the accident certainly played a role in his symptoms even though his radiographic and arthroscopic findings would not likely be expected to be substantially different than prior to the accident. With osteoarthritis or chondromalacia patella, patients are known in many cases to have rather sudden onset of pain which is continuous following a relatively minor traumatic event.

"In review of prior radiographs on patients such as this, it is clear that the degenerative process had been going on for some time prior to their becoming symptomatic. It is believed that these conditions may become rather abruptly painful following minor trauma or in some cases no trauma, due to the final thin

6

layer of articulate cartilage being finally worn off exposing direct contact with the bone beneath."

{¶ 15} Dr. Kalb's reports represent that Garrett's injury provoked his arthritic disability; however, Chrysler complains that Dr. Kalb testified differently during his two depositions.[2] According to Chrysler and the court of appeals, Dr. Kalb's deposition testimony conceded his uncertainty about the cause of Garrett's disability, making his opinion too equivocal to constitute some evidence for the commission's decision under *State ex rel. Owens-Corning Fiberglas Corp. v. Indus. Comm.* (1994), 70 Ohio St.3d 263, 265, 638 N.E.2d 565, 567 (commission cannot rely on a repudiated medical opinion or one that is "merely equivocal").

{¶ 16} Chrysler relies on this cross-examination from Dr. Kalb's first deposition:

"Q. Let me ask you to assume just hypothetically that the events of December 21st, 1985 did aggravate a pre-existing osteoarthritic condition in Mr. Garrett's knees. Is there any way you can say to a reasonable degree of medical probability that Mr. Garrett's knees would not be in the same condition that they are in today, even if the events of December 21st, hadn't happened? In other words, can you say that he would not have gotten to the point that he is today even if the events of December 21st, 1985 hadn't happened?

"A. No, I cannot say that.

"Q. And based on the the pre-existing congential problems which were significant in Mr. Garrett's knees, it would not be unfair to assume that he would be in the same condition today that he's in even if the events of December 21st hadn't happened?

"A. That is correct.

---

2. The commission's orders do not specify reliance on the Kalb depositions, but the parties do not dispute this.

"* * *

"Q. So what we've got is somebody whose having degenerative problems in his knees and from a medical standpoint there's no way that you can say that his condition is any worse today than it would otherwise have been even if what happened on December 21st hadn't happened.

"A. That is correct."

{¶ 17} Chrysler also relies on this cross-examination from Dr. Kalb's deposition taken two weeks later:

"Q. So you would agree, would you not, that based on the conditions that existed in Mr. Garrett's knees prior to the events of December 21st, 1985 you would have expected to see just over the normal course of time of degeneration an increase in symptoms and discomfort in his knees?

"A. That is correct.

"Q. There is no way that you can say today, Doctor, that Mr. Garrett's condition is any worse than it would have been even if the accident hadn't happened?

"A. That is correct."

{¶ 18} In response, Garrett insists that Dr. Kalb rehabilitated his testimony during the second deposition and with his January 1991 medical report. Garrett maintains that (1) Dr. Kalb repeatedly attributed Garrett's disability entirely to the injury-induced aggravation of his arthritis because Garrett had not experienced subjective symptoms of the condition before the accident, and (2) Dr. Kalb's inconsistency as to the cause of Garrett's problems was a mistake he later clarified and corrected. Clarification and correction, Garrett argues, resolves equivocation and sustains the evidentiary value of expert opinion. We agree.

{¶ 19} The rule that an equivocal medical opinion is "not evidence" on which the commission can rely emerged from *State ex rel. Jennings v. Indus. Comm.* (1982), 1 Ohio St.3d 101, 1 OBR 135, 438 N.E.2d 420; *State ex rel.*

*Paragon v. Indus. Comm*. (1983), 5 Ohio St.3d 72, 5 OBR 127, 448 N.E.2d 1372; and *State ex rel. Walters v. Indus. Comm*. (1985), 20 Ohio St.3d 71, 20 OBR 402, 486 N.E.2d 94. After reviewing this precedent, *State ex rel. Eberhardt v. Flxible Corp*. (1994), 70 Ohio St.3d 649, 657, 640 N.E.2d 815, 821-822, explained what constitutes equivocation by a medical expert:

"[E]quivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Ambiguous statements, however, are considered equivocal only while they are unclarified. *Paragon, supra.* Thus, once clarified, such statements fall outside the boundaries of *Jennings, supra*, and its progeny.

"Moreover, ambiguous statements are inherently different from those that are repudiated, contradictory or uncertain. Repudiated, contradictory or uncertain statements reveal that the doctor is not sure what he means and, therefore, they are inherently unreliable. Such statements relate to the doctor's position on a critical issue. Ambiguous statements, however, merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Such statements do not relate to the doctor's position, but to his communication skills. If we were to hold that clarified statements, because previously ambiguous, are subject to *Jennings* or to commission rejection, we would effectively allow the commission to put words into a doctor's mouth or, worse, discount a truly probative opinion. Under such a view, any doctor's opinion could be disregarded merely because he failed on a single occasion to employ precise terminology. In a word, once an ambiguity, always an ambiguity. This court cannot countenance such an exclusion of probative evidence."

{¶ 20} Here, Dr. Kalb offered two different conclusions as to the cause of Garrett's arthritis; however, the contradiction apparently resulted because of mistake, not uncertainty. His cross-examination testimony was based on the assumption that Garrett had experienced pain and swelling even before his knee

injury, which Dr. Kalb later realized was incorrect. On redirect, Dr. Kalb confessed that he had misunderstood his own operative notes and had drawn a conclusion contrary to Garrett's documented prior medical history. When asked to explain the contradiction, he said:

"Initially when giving the deposition and answering [Chrysler's counsel's] questions previously and reviewing this operative note on 3-14-86 I read the sentence: this disorder was made worse by injury.

"And I assumed that this disorder meant [Garrett's] complaints related to his problem.

"And from that single sentence I was assuming that he had related a history of some prior problem.

"In review of the physical examination and history from that date which was dictated at that time and in more detail, the history and physical examination, that indicates that that is not the case.

"In review of my entire record I have no documentation of [Garrett's] ever having had a problem or complaining of a problem prior to his injury as noted.

"And so that was inconsistent.

"Either that was an inaccuracy on my part; or by his disorder I meant his congenital disorder, namely chondromalacia patella.

"So either of those two are possibilities; either my * * * disorder sentence of 3-14-86 was not accurate; or more likely, I was referring to this disorder being the congenital problem with his patellofemoral malalignment because that directly conflicts with the dictated history and physical in terms of his having or not having had prior symptoms with his knees."

{¶ 21} And, on further redirect, the following exchange took place:

"Q. Now that you [Dr. Kalb] have had an opportunity to look at the entire document and to clarify the history, does that change your answers to [Chrysler's counsel's] questions in reference to [Garrett's] pre-existing condition?

"* * *

"A.     Yes; that is correct.

"Q.     And in reference to this document, which history is the reliable history?

"A.     The history and physical examinations intended to provide the history.  The information dictated on * * * the operative note is designed to give the indications for the procedure.

"Q.     So they serve two separate purposes?

"A.     That is correct."

{¶ 22} Whether we or the court of appeals is persuaded by this explanation is not at issue; ours are not the credibility determinations that count.  The commission is the exclusive evaluator of the weight and credibility to be given medical reports of record, and reviewing courts cannot second-guess the commission's credibility determinations in mandamus.  *State ex rel. Pass v. C.S.T. Extraction Co.* (1996), 74 Ohio St.3d 373, 376, 658 N.E.2d 1055, 1058; *State ex rel. Consolidated Coal Co. v. Indus. Comm.* (1997), 78 Ohio St.3d 176, 177, 677 N.E.2d 338, 341.  Thus, review extends only to whether some evidence exists for the commission's decision; after that, courts must defer to the commission's determination.

{¶ 23} For these reasons, this court in *Eberhardt* defended the commission's reliance on an ambiguous medical conclusion that was ultimately clarified by the doctor.  There we concluded that this was a credibility determination for the commission to make.  The same rule must apply when a physician offers contradictory conclusions by mistake, but later acknowledges the contradiction and resolves it to the commission's satisfaction.  In both cases, any uncertainty is destroyed and the reliability of the physician's statement is rejuvenated.

**{¶ 24}** Accordingly, we hold that where, as here, an inconsistent or contradictory medical conclusion can be attributed to mistake, as compared to lack of knowledge, and testimony or other medical evidence exists from which the commission could conclude that the mistake was resolved, the commission is able to rely on that evidence in granting or denying compensation or benefits. See, *e.g., State ex rel. Owens-Corning, supra,* 70 Ohio St.3d at 266, 638 N.E.2d at 567 (Douglas, J., dissenting) (where some evidence exists for the commission's decision, it must not be disturbed in mandamus, notwithstanding "[a]rtful cross-examination"). The court of appeals erred, therefore, in rejecting Dr. Kalb's testimony as too equivocal.

**{¶ 25}** We also reject Chrysler's argument that the commission had no evidence upon which to attribute Garrett's disability completely to the injury-induced aggravation of his arthritic condition. This argument is again based on the theory that Dr. Kalb's opinion is unreliable, although Chrysler frames it as an attack on a practice purportedly used by the commission — to attribute disability caused by a nonallowed pre-existing condition to the allowed aggravation of that condition.

**{¶ 26}** The commission cannot compensate claimants unless their disability results *exclusively* from an allowed condition. *State ex rel. Wean United, Inc. v. Indus. Comm.* (1993), 66 Ohio St.3d 272, 274, 611 N.E.2d 828, 829. Here, Dr. Kalb's reports and testimony satisfy this standard because he attributed Garrett's disability entirely to the aggravation of his arthritis, not to the pre-existing condition. Dr. Kalb concluded that while Garrett probably had arthritic changes prior to his injury that were detectable by radiological and arthroscopic tests, he had not experienced symptoms that had prevented him from working at Chrysler before his injury, which is the test for temporary total disability. *State ex rel. Bowie v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 458, 461, 663 N.E.2d 926, 929. Thus, contrary to Chrysler's argument, evidence exists from which the commission could find that Garrett had no pre-existing disability

attributable to his pre-existing condition. As *State ex rel. Kettering Med. Ctr. v. Wallace* (1994), 68 Ohio St.3d 588, 589, 629 N.E.2d 444, 446, explained:

"[The employer's] argument erroneously assumes that evidence of a pre-existing *condition* is *prima facie* evidence of a pre-existing *disability* as well. [The employer], however, ignores that claimant worked without any apparent problems prior to her industrial accident. Because her [pre-existing] psychological condition did not affect her ability to work before the accident, [the employer] cannot persuasively argue that the claimant had a pre-existing emotional *disability*. See *Marshall v. Ouachita Hosp*. (1980), 269 Ark. 958, 961, 601 S.W.2d 901, 902. (Appellate court upheld claimant's contention that although he was a polio victim, he had no pre-existing disability in the workers' compensation sense, since he had been able to work as a lab technician and perform all required tasks for twenty-two years prior to his work-related accident.)" (Emphasis *sic*.)

{¶ 27} Accordingly, we reverse the court of appeals' finding that the commission abused its discretion by awarding TTD and medical benefits without evidence tying Garrett's disability to his industrial injury.

*Permanency and Subsequent TTD Award*

{¶ 28} As an alternative basis for affirming the court of appeals' judgment, see *Morgan v. Cincinnati* (1986), 25 Ohio St.3d 285, 289-290, 25 OBR 337, 340-341, 496 N.E.2d 468, 472 (where necessary to preserve lower court judgment, R.C. 2505.22 allows appellee to assert assignments of error without filing cross-appeal), Chrysler argues that the commission had no jurisdiction to award Garrett TTD after having found his condition permanent and, effectively, at maximum medical improvement, pursuant to the DHO order of May 17, 1988. We disagree.

{¶ 29} As mentioned, in *State ex rel. Eaton Corp. v. Lancaster,* 40 Ohio St.3d at 407, 534 N.E.2d at 50, we invalidated the commission's policy, employed initially here when Garrett filed his PTD application, that permitted its hearing officers to continue PTD for "lengthy intervals" between the decision to terminate

TTD due to permanency and the decision to grant or deny PTD. But out of concern for claimants' welfare, we did not immediately terminate TTD for those claimants who were receiving it pursuant to the commission's defunct procedure. Rather, we directed the commission to implement a new process for assessing PTD eligibility, one that did not compromise the TTD requirement that a claimant's condition remain temporary while this compensation is paid, and to do so "within ninety days of [our] decision, or *as soon thereafter as is practicable*." (Emphasis added.) *Id*. at 408, 534 N.E.2d at 51. Thus, in that case and others, see, *e.g., State ex rel. Peabody Coal Co. v. Indus. Comm*. (1989), 41 Ohio St.3d 5, 534 N.E.2d 347, reconsidered and modified on other grounds (1989), 44 Ohio St.3d 104, 541 N.E.2d 74, we returned causes for the commission to rectify its having continued TTD despite a prior determination of permanency.

{¶ 30} In Garrett's case, Chrysler appealed the allowance of his aggravated arthritic condition to common pleas court pursuant to former R.C. 4123.519 shortly after we decided *Eaton*. As this appeal removed the claim from the commission's jurisdiction, *State ex rel. Gatlin v. Yellow Freight Sys., Inc.* (1985), 18 Ohio St.3d 246, 249, 18 OBR 302, 305, 480 N.E.2d 487, 490, the commission had little if any meaningful opportunity to comply with our decision. Only after the court of appeals reinstated the commission's order and invoked the commission's duty to conduct further consistent proceedings, see former R.C. 4123.519(F) (now R.C. 4123.512[G]) (commission and bureau of workers' compensation administrator must execute final court judgment as if it were the commission's decision), did the commission have the power and practicable ability to correct the problem *Eaton* identified. And the commission made the appropriate correction when it regained jurisdiction—the commission assigned Garrett's PTD claim to its "*Eaton* docket," a procedure that sanctioned expedited review of PTD applications in conjunction with motions to terminate TTD. Cf. *State ex rel. Ford Motor Co. v. Indus. Comm*. (1992), 65 Ohio St.3d 17, 599 N.E.2d 261 (TTD award after permanency

determination invalidated under *Eaton* because commission had continuous jurisdiction over claim and did not expeditiously comply). We have since endorsed this procedure, *State ex rel. Blake v. Indus. Comm.* (1992), 65 Ohio St.3d 453, 455, 605 N.E.2d 23, 25; *State ex rel. Kinnear Div., Harsco Corp. v. Indus. Comm.* (1997), 77 Ohio St.3d 258, 265-266, 673 N.E.2d 1290, 1296, and Chrysler offers neither evidence nor argument to establish that the commission failed to act "as soon as practicable" in making this assignment. Thus, under these circumstances, we consider the commission's response time to our admonition in *Eaton* to comply with that decision. Accordingly, we reject Chrysler's argument that the commission's prior determination of permanency precluded its further award of TTD to this claimant.

{¶ 31} For those claimants who were receiving TTD benefits despite a finding of permanence at the time *Eaton* was decided, we directed the commission "as soon thereafter as is practicable, to hold hearings to determine the eligibility of these claimants for *total* disability benefits." (Emphasis added.) *Eaton*, 40 Ohio St.3d at 408, 534 N.E.2d at 51. We did not limit the issue at such hearings to a determination of permanent total disability. Instead, it was contemplated that the commission would, at these hearings, determine both the claimant's continued eligibility for TTD and eligibility for PTD. Otherwise, there would have been no need for the court in *Eaton* to consider, as it did, whether "[i]n each case, the relied-on medical evidence uniformly indicated a permanent condition." *Id*. at 411, 534 N.E.2d at 53. Thus, under the present circumstances, there was no need for the commission to premise its continuing TTD on new and changed circumstances.

{¶ 32} *Eaton* notwithstanding, the claimant's need for surgery, under the facts of this case, constitutes a new and changed circumstance. It is true, as pointed out in the concurring and dissenting opinion, that Dr. Kalb predicted in 1988 that Garrett would benefit from patellectomy, or knee replacement. However, no request for authorization was made at that time, and this issue was neither presented

nor decided at the 1988 hearing. It was not until after the 1988 administrative proceedings that Dr. Kalb, in a report dated September 11, 1989, devised a plan for claimant to "apply for Worker's Compensation [*sic*] approval for bilateral knee replacement arthroplasty," noting "progressive pain in both knees" and that such "knee pain has become intolerable now bilaterally."

{¶ 33} Thus, at the time claimant's condition was found permanent in 1988, the issue whether claimant would need surgery, and whether such surgery would improve claimant's condition, was not litigated and, under these facts, could not have been litigated. When the advent of further surgery arose after 1988, there was a new and changed circumstance which justified modification pursuant to R.C. 4123.52. See *Stainless Specialty Mfg. Co. v. Indus. Comm.* (1985), 144 Ariz. 12, 695 P.2d 261.

*Adequate Explanation*

{¶ 34} Also to preserve the judgment below, Chrysler proposes that the commission failed to sufficiently explain its TTD award as required by *State ex rel. Mitchell v. Robbins & Myers,* 6 Ohio St.3d at 483-484, 6 OBR at 534, 453 N.E.2d at 724 (commission must state evidence and give brief explanation for decision to grant or deny TTD). But rather than attack the commission's cursory explanation, Chrysler uses the opportunity to resurrect its "no-evidence-of-causation" argument. We reject this argument for the reasons already discussed. We further conclude that while the instant commission order is less than comprehensive, it is at least as informative as the order in *Mitchell*, which was vacated due to lack of evidence, not for inadequate explanation. *Id.* at 484, 6 OBR at 534, 453 N.E.2d at 724. Accordingly, we cannot grant Chrysler any relief on this basis.

*Reimbursement*

{¶ 35} Chrysler also insists that if we reverse in Garrett's favor, it is still entitled to reimbursement from the Surplus Fund because the commission failed to appeal. Again, we disagree.

**{¶ 36}** The source of Chrysler's asserted right to reimbursement is former R.C. 4123.515,[3] which provided, in part:

"[I]f the decision of the district hearing officer is appealed by the employer or the administrator, the bureau shall withhold compensation and benefits during the course of the appeal to the regional board of review, but where the regional board rules in favor of the claimant, compensation and benefits shall be paid by the bureau or by the self-insuring employer whether or not further appeal is taken. *If the claim is subsequently denied*, payments shall be charged to the surplus fund created under division (B) of section 4123.34 of the Revised Code, and if the employer is a state risk such amount shall not be charged to the employer's experience and if the employer is a self-insurer such amount shall be paid to the self-insurer from said surplus fund." (Emphasis added.) 137 Ohio Laws, Part II, 3934, 3939.

**{¶ 37}** This statute allowed reimbursement only if compensation had been *denied* on appeal from the regional board of review. Accord *State ex rel. Peabody Coal Co. v. Indus. Comm.* (1989), 44 Ohio St.3d 104, 105, 541 N.E.2d 74, 75; *State ex rel. Eaton v. Lancaster* (1989), 44 Ohio St.3d 106, 541 N.E.2d 64; and *Eaton,* 40 Ohio St.3d at 416, 534 N.E.2d at 58 (Douglas, J., dissenting). Garrett was not denied compensation at subsequent levels of commission or judicial review; the TTD and medical benefit awards were left undisturbed. As former R.C. 4123.515 confers no right to reimbursement where the claimant prevails, Chrysler is not entitled to reimbursement under these facts.

---

3. R.C. 4123.515 was repealed effective October 20, 1993. On that same date, R.C. 4123.519 was amended and renumbered R.C. 4123.512, which provides that, "Any action pending in common pleas court or any other court on January 1, 1986, under this section is governed by former sections * * * 4123.515 * * * and 4123.519 * * * of the Revised Code." The present action was not pending in any court on January 1, 1986. Chrysler contends that any attempt to apply this legislation retroactively to preclude reimbursement would be unconstitutional. Because we find that former R.C. 4123.515 confers no right to reimbursement where the claimant ultimately prevails on the issue of entitlement to TTD, there is no need to address the retroactive application of R.C. 4123.512.

{¶ 38} Having found that some evidence exists for the commission's decision and that none of Chrysler's other arguments justifies the court of appeals' judgment in Chrysler's favor, we reverse the order granting a writ of mandamus and reinstate the commission's award to Garrett of TTD and medical benefits.

*Judgment reversed.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 39} I concur with the majority's conclusion that the claimant may be awarded temporary total disability compensation ("TTD") pending a determination of claimant's eligibility for an award of permanent total disability compensation ("PTD"). However, I dissent from the majority's decision that Chrysler is not entitled to be reimbursed for the amount of TTD it paid to the claimant after it was determined that his condition was permanent.

{¶ 40} I do not necessarily disagree that the *Eaton* rationale might justify continuing TTD, pending the hearing to determine PTD.[4] However, the majority agrees with the claimant's contention that his condition is not permanent and therefore TTD should be reestablished. I disagree. The commission cannot exercise continuing jurisdiction unless new and changed circumstances have

_____

4. In *State ex rel. Eaton Corp. v. Lancaster* (1988), 40 Ohio St.3d 404, 534 N.E.2d 46, this court invalidated a policy instituted by the commission where it continued to award TTD to a claimant whose condition had been determined to be permanent while the claimant was waiting for a hearing to award PTD. (The commission has no jurisdiction to award TTD when the claimant's condition has been determined to be permanent.) However, in an attempt to prevent this "gap" in coverage of the benefits, the court essentially ordered the commission to create a procedure whereby the determination of permanency and the award of PTD occur simultaneously or as close together as practically possible.

In this case, the majority has cited *Eaton* to justify the commission's continued payment of TTD to the claimant pending his hearing for PTD.

developed since the initial order. *State ex rel. Bowman v. Indus. Comm.* (1992), 65 Ohio St.3d 317, 319, 603 N.E.2d 1000, 1002. Further, a claimant is not entitled to TTD when the commission has determined that the claimant's condition has become permanent. *State ex rel. Jeep Corp. v. Indus. Comm.* (1991), 62 Ohio St.3d 64, 575 N.E.2d 1095.

{¶ 41} In the case at bar, on May 17, 1988, a DHO recognized that the claimant's condition of "aggravation of pre-existing bilateral pat[]ellofemoral arthritis" had become permanent. Chrysler challenged the allowance of benefits to the claimant in common pleas court. The jury found that the claimant could not participate in the State Insurance Fund for the aggravated arthritic condition. Chrysler stopped paying TTD in 1990. However, the court of appeals reversed.

{¶ 42} Pursuant to the court of appeals' judgment, the commission formally recognized the claimant's claim for "aggravation of a pre-existing bilateral pat[]ellofemoral arthritis." At a rehearing, a DHO ordered Chrysler to make up the TTD payments stopped after the common pleas court ruling and to continue TTD based on submission of medical evidence. The DHO also determined that the claimant's disability, "based upon all the allowed conditions had not yet reached maximum medical recovery," and therefore authorized surgery to replace the claimant's right knee. Thus, this issue was fully litigated.

{¶ 43} The court of appeals' decision merely affirmed the commission's allowance of the claimant's arthritic condition and that this condition was permanent. Since the determination by the commission that the claimant's condition had become permanent, there has been no circumstance indicating a change in his condition.

{¶ 44} The claimant claims that he had again become temporarily totally disabled after Chrysler cut off his TTD in August 1990. The claimant cites the syllabus of *State ex rel. Bing v. Indus. Comm.* (1991), 61 Ohio St.3d 424, 575 N.E.2d 177, which states:

"Even where temporary total disability compensation payments have been previously terminated, R.C. 4123.52 grants the Industrial Commission continuing jurisdiction to award temporary total disability compensation where the claimant has again become temporarily totally disabled."

{¶ 45} The claimant relies upon Dr. Kalb's reports concerning the continued deterioration of his condition and need for surgery, arguing that these are the type of circumstances that justify the commission's reassessment of his TTD eligibility.

{¶ 46} However, an examination of Dr. Kalb's 1991 report reveals that his opinion is neither new nor significantly different. Dr. Kalb had predicted that the claimant would benefit from patellectomy, or knee replacement, back in 1988.

{¶ 47} Further, the claimant did not suffer a temporary decline in his condition that again prevented him from returning to work. Rather, his condition declined steadily, and he never returned to work after the industrial injury. The claimant's consistent inability to work distinguishes this case from permitted exercise of the commission's continuing jurisdiction to revisit and award TTD where the claimants were unable to work on two separate occasions, the second due to a "flare-up" or relapse in a single maximum medically improved condition. See *Bing,* 61 Ohio St.3d at 427, 575 N.E.2d at 180; *State ex rel. Navistar Internatl. Transp. Corp. v. Indus. Comm.* (1993), 66 Ohio St.3d 267, 611 N.E.2d 824. Simply because a predicted condition or surgery results, the commission should not be required to reopen every permanency case to restore TTD.

{¶ 48} When the commission has determined that a claimant's condition is permanent, the claimant is not eligible for TTD. *State ex rel. Ramirez v. Indus. Comm.* (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586. Without new and changed circumstances, fraud, clerical error, or unauthorized action by an inferior administrative tribunal, the commission cannot revisit and revise a prior

denial of TTD due to permanency. *Bowman,* 65 Ohio St.3d at 319, 603 N.E.2d at 1002.

{¶ 49} For the aforementioned reasons, the commission had no jurisdiction to award the claimant TTD after it left the DHO's 1988 finding of permanency undisturbed. Accordingly, although I would allow TTD to continue under the *Eaton* doctrine pending the final hearing on PTD, I would affirm the portion of the court of appeals' decision that held that the commission's May 17, 1988 permanency determination precluded *restoration* of TTD.

{¶ 50} Because I would find that the commission had no jurisdiction to *restore* an award of TTD to the claimant after his condition was determined to be permanent, Chrysler should not be responsible for the payment of TTD after permanency was determined. As Justice Douglas pointed out in his concurrence in *Eaton*, 40 Ohio St.3d 416-417, 534 N.E.2d at 57-58, an employer should be entitled to reimbursement for TTD funds erroneously paid under an invalidated procedure for continuing to award TTD.

{¶ 51} Accordingly, I would find (1) that the claimant's condition had not changed since the May 17, 1988 finding of permanency, (2) that once the claimant's condition was determined to be permanent, the commission had no jurisdiction to restore TTD, and (3) notwithstanding the commission's lack of jurisdiction to restore TTD, the commission is authorized to temporarily continue TTD under the *Eaton* rationale until a hearing on PTD can be held. I would also find that since the commission had no jurisdiction to restore TTD to the claimant, Chrysler should be reimbursed from the Surplus Fund for the TTD payments made to the claimant after May 17, 1988.

{¶ 52} For these reasons, I respectfully concur in part and dissent in part.

MOYER, C.J., and COOK, J., concur in the foregoing opinion.

———————————