DECISION
{¶ 1} Relator, K-Mart Corporation, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent, Charlotte A. Crabtree, for permanent total disability ("PTD") compensation, and issue an order denying the requested compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. Relator has filed objections to the magistrate's decision.
 {¶ 3} In general, relator merely reargues the same issues it did before the magistrate. We agree with the magistrate that the July 3, 2001 report of Dr. Thomas Heiskell was not inconsistent with his July 3, 2001 office notes, and the conclusions in the July 3, 2001 report are not inconsistent with his opinion of June 5, 2001. Relator does raise an argument that the magistrate used the wrong legal standard in finding in finding no contradiction or inconsistency in these reports. Relator asserts that the magistrate found no "fatal inconsistency or contradiction" in these reports, and the proper standard is any inconsistency. However, there is no indication anywhere in the magistrate's decision that the magistrate believed the reports contained any degree of inconsistency. The magistrate's use of the word "fatal" does not indicate that an inconsistency existed. Therefore, we find that Dr. Heiskell's reports and notes constituted some evidence upon which the commission could rely.
 {¶ 4} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
KLATT, J., and PETREE, P.J., concur.
 IN MANDAMUS {¶ 5} Relator, K-Mart Corporation, filed this original action asking the court to issue a writ of mandamus compelling respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Charlotte A. Crabtree for compensation for permanent total disability ("PTD") and to issue an order denying the requested compensation.
Findings of Fact:
 {¶ 6} 1. Charlotte A. Crabtree ("claimant") has three workers' compensation claims. The allowed conditions, listed in the order quoted below, include major depression and anxiety disorder.
 {¶ 7} 2. On January 29, 2001, claimant visited her psychologist, Thomas Heiskell, Ph.D., whose notes state, in part:
 {¶ 8} "* * * [S]he's still showing improvement, and we want to see her having contact with her sister and having activities with her * * *. We also want to see her able to tolerate being around groups of people. `I got where I felt like I was going to cry' and she was feeling distressed. `I thought I was choking . . . and I left'. Obviously if she cannot tolerate being in the library without this degree of emotional distress at this point her depression and anxiety currently prevent her from working in a light duty setting — the stress of waiting in line at the library being clearly less than the demands of light duty work. * * *
 {¶ 9} "* * * We want her to be able to tolerate public contacts without crying or getting anxious and fleeing — and to get more contacts with her sister. She needs to practice relaxation responses, and we started that today."
 {¶ 10} 3. Claimant continued to visit Dr. Heiskell, and the file includes his progress notes. For example, on May 8, 2001, claimant reported that she was better. She had successfully gone to the library, gotten videos, and then returned them. She had been able to go shopping at K-Mart, something she had not been able to do in a year.
 {¶ 11} 4. On May 22, 2001, Dr. Heiskell reported that claimant was better and had been able to travel to her daughters' homes twice and to the library. However, she felt too anxious to help with a graduation party, afraid that she would mess something up because she hadn't done anything like that in a long time. They agreed that claimant would ask for a small task to help with the preparations and share her fear about messing up, or she could help with a young grandchild, but Dr. Heiskell cautioned that, if claimant undertook both assignments, it would be too much for her. However, he felt her condition was improving.
 {¶ 12} 5. On June 5, 2001, claimant visited Dr. Heiskell, and he completed a C-84 form to continue temporary total disability ("TTD"). On the form, he stated that claimant was unable to return to her former job, light duty, or modified work due to major depression and anxiety disorder. He commented as follows: "Barely copes with day to day stressors. Sleep marginal to poor. Slow in filling out simple forms. Zung Depression Scale 81 = Severe [and hers] was 84." In regard to whether claimant had reached maximum medical improvement ("MMI"), Dr. Heiskell stated that claimant "can somewhat increase community contacts 
[increase] her sense of contributing being of value in the life of her family." He certified that the disability continued to the present, and he estimated a return-to-work date of October 2001. In regard to rehabilitation focusing on a return to work, Dr. Heiskell stated that claimant was too depressed and that her physical limitations were also a barrier.
 {¶ 13} 6. In his offices notes for June 5, 2001, Dr. Heiskell reported, including claimant's comments:
 {¶ 14} "* * * I helped a little putting things out for my grandson's graduation. I went to his graduation but I left right after he got his diploma . . . I got real sad and just started to cry.
 {¶ 15} "* * * [N]ot tearful today, some smiling, face is less tense. * * * Slept 3-4 hours only last several nights. Sometimes 4-5 hours, still has awakening during the night. Crying now 4-5 times per week. Passive suicidal ideation, no intent. `I get to feeling bad'.
 {¶ 16} "* * * [I]mproving some, but stress tolerance clearly, as noted above, remains below levels that would be needed to cope with work[.]
 {¶ 17} "* * * [S]upportive therapy monthly to encourage continued activities as tolerated and prevent withdrawal and decreased functioning from her current level. She might increase what she is doing a little from this point. [C]ontinue going to the library, seeing her daughters, have one of her daughters take her to K Mart to shop and see people there she knows and visit for a time with them[.]
 {¶ 18} "Note: Atty David Spears: I do not believe she has yet reached maximum medical improvement. Her sleep is still too poor, and she is having too few routine contacts outside her home to be at MMI. These are goals she can achieve. Whether she will be able to work after that is questionable, but will need to be determined later."
 {¶ 19} 7. On June 27, 2001, the commission terminated TTD compensation based on attainment of MMI of the psychological conditions.
 {¶ 20} 8. Claimant returned to Dr. Heiskell on July 3, 2001. At that time, he opined:
 {¶ 21} "In my opinion Ms. Crabtree has reached a practical limit of maximum medical improvement regarding her employability. I believe that episodes of tearfulness, which are less intense, which have still continued daily can be reduced further by working on the guilt that provokes them. In my opinion she is not able to return to work. This is best illustrated by the cumulative information present in my progress notes. She is barely able to cope with participation in family gatherings where she as to take on tasks that present a challenge and risk of failing. Her ability to cope with stress remains poor. The goal is for her to maintain family contacts and family activities, though she often doesn't want to go when asked to. Without treatment this modest gain would be very apt to relapse. I want to see her have contact with others, but she has not even been able to bring herself to drop by K Mark anytime recently in spite of my urging. Her ability to cope with relationships is markedly impaired. She is vulnerable and would withdraw with interpersonal stresses. She is fortunate that she has very supportive adult daughters who are now in this area. Without them it is doubtful she would have been able to have made much recovery at all. Her ability to maintain daily activities is mildly limited. Her concentration is mildly to moderately limited. Overall in my opinion, principally due to her poor stress tolerance and limitations in handling relationships other than extremely supportive ones, she is in my opinion permanently and totally disabled for all forms of work."
 {¶ 22} 9. On July 3, 2001, Dr. Heiskell's office notes state that claimant was sleeping better and was not feeling so fatigued. She stated that, although she sometimes did not want to got out of the house, she would "get out there" and "it's okay." Dr. Heiskell concluded that "the main goal of her having contacts instead of staying severely isolated has been successful." However, he urged that this progress "needs to be maintained" and that claimant would be at risk for a relapse "without supportive treatment." He worked with claimant in regard to accepting help from her daughters without feeling guilty and on engaging in less crying.
 {¶ 23} 10. On August 14, 2001, claimant's treating physician, R. Aaron Adams, D.O., provided a brief opinion that, due to claimant's herniated disc at C4-5 with radicular pain into the left upper extremity, she was permanently and totally disabled.
 {¶ 24} 11. On August 29, 2001, claimant filed a PTD application with the reports of Drs. Heiskell and Adams in support.
 {¶ 25} 12. The file included reports from Robin Stanko, M.D., Donald Brown, M.D., Richard Clary, M.D., Lee Howard, Ph.D., Michael Murphy, Ph.D., and others.
 {¶ 26} 13. In June 2002, a PTD hearing was held, resulting in an order granting compensation:
 {¶ 27} "It is the finding of the SHO that: claim #95-511103 has been recognized for `aggravation of pre-existing herniated disc at C4-5, impingement of left shoulder['] (DHO 01/04/1996); ' major depression, anxiety disorder' (SHO 08/30/2000). Claim #L219134-22 has been recognized for `torn medial meniscus left knee['] (employer letter 11/16/1992). Claim #95-361003 has been recognized for `herniated disc, left, C4-5 and radiculopathy left shoulder' (SHO 10/04/1995).
 {¶ 28} "After full consideration of the issue it is the order of the Staff Hearing Officer that the Application filed 08/29/2001, for Permanent and Total Disability Compensation, be granted to the following extent:
 {¶ 29} "Permanent and total disability compensation is hereby awarded from 07/03/2001 and to continue without suspension unless future facts or circumstances should warrant the stopping of the award; and that payment be made pursuant to Ohio Revised Code Section 4123.58(A).
 {¶ 30} "The SHO has carefully considered all evidence in file and presented at hearing.
 {¶ 31} "It is the finding of the SHO that the claimant is permanently and totally disabled.
 {¶ 32} "The SHO relies upon the reports of Dr. Heiskell and Dr. Adams. These reports supports [sic] the conclusion that the allowed medical conditions in these claims in and of themselves render the claimant permanently and totally disabled from engaging in any type of sustained remunerative employment.
 {¶ 33} "Since it is the finding of the SHO that the allowed conditions in these claims have on a medical basis rendered the claimant permanently and totally disabled from engaging in any sustained remunerative employment, the SHO does not find it necessary to consider or to discuss the claimant's non-medical disability factors of age, education, and prior work experience. State, ex rel. Libbey-Owens Ford v. I.C. (1991) 62 Ohio St.3d 6.
 {¶ 34} "The start date of the payment of the Permanent and Total Disability Compensation is 07/03/2001. The SHO chooses this date because it is the date of the persuasive report of Dr. Heiskell."
Conclusions of Law:
 {¶ 35} The employer challenges the award of PTD compensation, arguing that Dr. Heiskell's medical report was fatally equivocal and could not constitute "some evidence" on which the commission could rely. Specifically, the employer argues that Dr. Heiskell's report of July 3, 2001, was contradicted not only by the C-84 report of June 2001 but, also, by the doctor's office notes of July 3, 2001.
 {¶ 36} It is well established that a medical report cannot constitute "some evidence" if it is internally inconsistent, fatally ambiguous, or is contradicted by another of the doctor's reports. See, e.g., State ex rel. Chrysler Corp. v. Indus. Comm. (1998),81 Ohio St.3d 158; State ex rel. Taylor v. Indus. Comm. (1995),71 Ohio St.3d 582; State ex rel. Eberhardt v. Flxible Corp. (1994),70 Ohio St.3d 649.
 {¶ 37} The alleged inconsistency in Dr. Heiskell's report is regarding the tempor-ariness or permanency of her conditions. Under Ohio Adm. Code 4121-3-32(A)(1), MMI is defined as:
 {¶ 38} "* * * [A] treatment plateau (static or well-stabilized) at which no fundamental functional or physiological change can be expected within reasonable medical probability in spite of continuing medical or rehabilitative procedures. A claimant may need supportive treatment to maintain this level of function."
 {¶ 39} Under R.C. 4123.56(A), temporary total compensation is awarded for temporary disability during the period of healing and recovery following an industrial injury. E.g., State ex rel. Matlack, Inc. v. Indus. Comm. (1991), 73 Ohio App.3d 648. Such compensation ceases when the disability has become permanent, that is, when the condition has reached MMI. State ex rel. Ramirez v. Indus. Comm. (1982),69 Ohio St.2d 630.
 {¶ 40} As a patient heals, recuperation may be swift or gradual; improvement may be obvious or almost imperceptible from week to week. Further, progress may not be a smooth upward climb but may involve setbacks. In addition, while MMI is readily observable with some types of conditions, it can be difficult to determine in others. For example, when a claimant has a wound or broken arm, or a toxin in the blood, doctors can determine with some precision when the condition has abated or healed.
 {¶ 41} However, with other conditions, including some psychological conditions, MMI is less certain and may be far more a matter of opinion. In those circumstances, the treating doctor, over the course of continued visits and through monitoring the patient's symptoms, will finally reach the conclusion that the claimant is unlikely to get any better with continued treatment. Given the dearth of objective measures, medical opinions are likely to vary significantly. See, generally, State ex rel. Kroger v. Indus. Comm. (1998), 82 Ohio St.3d 231 (stating that the process of psychiatric/psychological diagnosis is largely based on the doctor's impressions based on subjective analysis and filtered through the experience of the doctor, which makes it very difficult for the doctor to offer definite conclusions about any particular patient).
 {¶ 42} In the present action, claimant had been showing steady improvement in 2001, although Dr. Heiskell indicated that it was questionable whether she would ever improve enough to return to work. Her visits to the doctor became less frequent. On June 5, 2001, language relating to MMI is beginning to be seen in Dr. Heiskell's notes, in that he talks about "supportive therapy" and claimant's need for treatment to prevent a decrease in function. In the C-84 of that date, Dr. Heiskell was already indicating that there was little likelihood for significant improvement. For example, he stated in regard to MMI that claimant could "somewhat" increase her functioning.
 {¶ 43} Then, on June 27, 2001, the commission ruled that claimant's conditions had reached MMI. Although Dr. Heiskell stated on July 3, 2001, that he believed that the amount of crying could be reduced further, he accepted the permanency of the condition as of that date, and wrote a report describing claimant's extent of disability at that point.
 {¶ 44} The magistrate sees no reason that the report of July 3, 2001 cannot support a finding of PTD. In June 2001, Dr. Heiskell expressed the opinion that his patient was capable of increasing her functioning, which is not fatally inconsistent with opining in July 2001 that claimant has reached MMI as a practical matter.
 {¶ 45} In July 2001, about a month later, the office notes state that claimant was sleeping better and not feeling so fatigued. Claimant reported that, although she was sometimes reluctant to leave her house, she could do it and would then find that it was okay. Dr. Heiskell explicitly concluded that "the main goal of her having contacts instead of staying severely isolated has been successful."
 {¶ 46} The notes and reports do not contradict the finding of permanency that he set forth in his July 3, 2001 report. The July 2001 notes and report were not an inexplicable departure from the prior notes and reports such that a further explanation was necessary to avoid fatal ambiguity. Dr. Heiskell's comment in the notes that he would like to see a reduction in crying episodes was not tantamount to a statement that material improvement was expected in that area, and his notes focused primarily on maintaining the level of improvement and providing supportive treatment to avoid relapse. See, generally, State ex rel. Consolidation Coal Co. v. Indus. Comm. (1997), 78 Ohio St.3d 176 (concluding that, where the doctor stated unequivocally that the conditions had reached a level of permanency but, also, indicated that claimant might have some room to heal, the report did not contradict a finding of permanency).
 {¶ 47} In sum, the magistrate finds no fatal inconsistency or contradiction — either between the June and July reports or within the July report — that would require the court to remove Dr. Heiskell's July 3, 2001 report from evidentiary consideration in a PTD hearing.
 {¶ 48} Finally, the magistrate notes that the commission was within its discretion to rely on the reports of Drs. Heiskell and Adams rather than the other medical reports. State ex rel. Bell v. Indus. Comm. (1995), 72 Ohio St.3d 575. In mandamus, this court must uphold a commission order supported by "some evidence," even where the contrary evidence is greater in quantity and/or quality. State ex rel. Pass v. C.S.T. Extraction Co. (1996), 74 Ohio St.3d 373.
 {¶ 49} The reports on which the commission relied constituted "some evidence" and, therefore, the magistrate recommends that the court deny the requested writ of mandamus.