THE STATE EX REL. MOORE, APPELLANT, *v.* INTERNATIONAL
TRUCK & ENGINE ET AL., APPELLEES.

[Cite as *State ex rel. Moore v. Internatl. Truck &
Engine,* 116 Ohio St.3d 272, 2007-Ohio-6055.]

(No. 2006–2396—Submitted September 18, 2007—Decided November 20, 2007.)

---

**Per Curiam.**

{¶ 1} Appellee Industrial Commission of Ohio terminated the temporary total benefits of appellant, Sally A. Moore, on the basis that she had reached maximum medical improvement. Moore later sought further temporary total disability compensation. We must determine whether the commission abused its discretion in refusing to award compensation. For the reasons to follow, we return the case to the commission for further consideration and an amended order.

{¶ 2} Moore worked in the molding department of appellee International Truck & Engine ("ITE"). As part of her duties, she sanded truck hoods in preparation for painting, which resulted in dust throughout Moore's immediate work area.

{¶ 3} The dust was made up of an IMC coating. The chemical composition of this substance is not disclosed in the record, but it is undisputed that Moore quickly developed white blister-like spots on her face, neck, and arms. Unfortunately, the condition, ultimately diagnosed as "prurigo nodularis," is accompanied by—as one doctor describes—an "incredible itching sensation" that even the "most potent medicines" cannot help. Dr. Alan J. Parks noted that "[t]ypically the patients excoriate these areas even to the point of causing scarring." Moore did, after years of exposure, end up with scarring on the affected areas. The scarring was also accompanied by hypopigmentation and eventually lichenification, which is a "thickening of the skin [with] exaggeration of the normal skin markings, giving the skin a leathery bark-like appearance." MedicineNet.com, at http://www.medterms.com/script/main/art.asp?articlekey=10131.

{¶ 4} Medical opinion was unanimous that Moore's condition was directly related to her exposure to IMC dust. A workers' compensation claim was initially allowed for "prurigo nodularis and lichenification" and later for "depressive disorder."

{¶ 5} In approximately 2002, Moore began treatment with a plastic reconstructive surgeon, Dr. Haroon A. Aziz. Dr. Aziz describes Moore's course of treatment in a November 19, 2004 letter:

{¶ 6} "Over the course of the last couple of years, we have been trying to treat her intensively with manipulation of the skin pigment and preparation of the skin for laser resurfacing primarily with the Erbium laser. The approach and the objects of the procedure has [sic] been to even the skin, at the depth to which making the depressed scars less noticeable and also to some extent dealing with the hyper/hypopigmentation. Over the last couple of years, Ms. Moore's face and both upper extremities has [sic] been treated a couple of times with the Erbium laser. The net result to date is definite improvement in the overall smoothness of the upper extremities and the face and neck area. There is much more even 'depth' to the uninjured skin and the injured skin where there has been dermal loss. The patient, her husband and my staff concur there has been definite improvement following the several treatments Ms. Moore has endured.

{¶ 7} "My current plan of action with Ms. Moore is continued treatments with the Erbium laser. In hopes of essentially smoothing out the skin, removing the raised area in small increments to even out the entire surface of the skin. Thereby making less of a contrast on her skin and more smooth and even appearance.

{¶ 8} "There is a potential for scarring with the laser, particularly if depth of the surface area is too deep, such as significantly into the reticular dermis. As a result, we really do not have much choice but to proceed with carefully graduated treatments in increments so as to produce an optimal result without any unnecessary secondary scarring.

{¶ 9} "Typically, treatment consists of preparation of the skin several weeks prior to the Erbium treatment with use of hydrocodone, Retin–A and topical steroids. This preparatory treatment is followed by the laser resurfacing treatment and then subsequent healing/regeneration of the skin over the course of the next week or two. Subsequent follow-up and assessment examinations will continue for roughly two to three months. At that point, depending upon the degree of improvement and the overall status, a decision would be tentatively made whether additional treatments would be required or not.

{¶ 10} "Whereas the course of treatment has been prolonged and tedious, I feel the end results certainly has [sic] justified the rather intolerable situation she has endured with severe scarring following the chemical injury. Furthermore, in my opinion, I feel additional treatments will benefit her overall end result particularly since maximum medical improvement has not yet been achieved."

{¶ 11} During this time, Moore was receiving temporary total disability compensation, but the record does not indicate whether it was continuous or intermittent. On October 8, 2004, Moore was examined on ITE's behalf by Dr. Homer E. Williams, who reported:

{¶ 12} "On examination, multiple hypopigmented and atrophic scars were present on her face, upper extremities, neck and anterior trunk. No hypertrophic scars or excoriations are present.

{¶ 13} "Answers to your questions follow:

{¶ 14} "1.) The claimant does exhibit severe scarring as a result of her physical conditions.

{¶ 15} "2.) The condition is expected to be permanent.

{¶ 16} "3.) Maximum medical improvement is believed to have been reached.

{¶ 17} "4.) Dr. Aziz's course of treatment has been appropriate. I am not of the opinion that any further surgical procedures are indicated."

{¶ 18} Dr. Williams's report generated a motion from ITE to stop Moore's temporary total disability compensation based on maximum medical improvement ("MMI"). The district hearing officer had before her the November 19, 2004 report from Dr. Aziz and the Williams report. The hearing officer, based on the Williams report, found that MMI had occurred and terminated temporary total disability compensation. That order became final.

{¶ 19} In 2005, further laser treatment was approved for Moore. That procedure was performed in May. Moore sought to reinstate temporary total disability compensation, but it is unclear for what period. C–84 "Requests for Temporary Total Compensation" forms show an ongoing disability, although Dr. Aziz's May 11, 2005, and July 5, 2005 forms certify a postoperative disability period of May 16 through September 5, 2005. The district hearing officer denied temporary total disability compensation:

{¶ 20} "The claimant has not proved by a preponderance of the evidence that the allowed conditions in the claim have rendered her, once again, temporarily and totally disabled. The District Hearing Officer notes that the allowed conditions in the claim were found to have reached maximum medical improvement pursuant to the District Hearing Officer order dated 11/23/2004.

{¶ 21} "The District Hearing Officer recognizes the fact that the claimant underwent a Cosmetic surgical procedure on 05/27/2005. However, it is unclear to the District Hearing Officer based on the available medical evidence how this cosmetic surgical procedure rendered the claimant, once again, temporarily and totally disabled. The C–84 of Dr. Aziz dated 08/05/2004 (C–84 on file prior to the maximum medical improvement finding) and the present C–84 of Dr. Aziz dated 07/05/2005 contain the exact objective finding.

{¶ 22} "Since the same objective finding has been present since 2004, the District Hearing Officer does not find any new and changed circumstances that would render the claimant temporarily and totally disabled. Dr. Aziz has not provided any current narrative explanation as to how this current cosmetic surgical procedure prevented the claimant from working from 11/23/2004 forward."

{¶ 23} Dr. Aziz responded with a September 8, 2005 letter:

{¶ 24} "[Ms. Moore] has been under my care for about two years now. I am a little disturbed at general feelings about her overall clinical situation.

{¶ 25} "In my humble opinion, I believe Ms. Moore had a serious skin loss with damage and scarring following her chemical burns at the place of her employment. The areas involved are both upper extremities and face. The resultant areas of scarring have been areas of deep dermal loss down to the reticular dermis with hypopigmentation and depression of the areas as well as scar formation. Over the last several years, we have been trying diligently to improve her overall situation. She has had multiple peels and several laser resurfacing procedures. These procedures have been primarily directed towards smoothing out the skin and reducing the surrounding raised areas to match up with the valleys and depressions.

{¶ 26} "Her treatment has been complicated by the fact that she is prone to skin infections, which certainly delay and interfere with surgical treatment. The other problem we are dealing with is a problem of hypopigmentation of the scarred areas. The effort is to try to normalize the re-pigmentation of the upper extremities and the facial areas so the overall end result is improved.

{¶ 27} "Whereas the residual of the injury has a significant cosmetic component, one must never forget the stigma the scarring has and the effect of that stigma on the personal well-being and self-image of the individual is significant.

{¶ 28} "In my opinion, she has had several laser treatments with continued improvement following each treatment both objectively on my part and subjectively on the part of the patient and her husband. I really feel maximum medical improvement has not been reached because she still has potential to be improved upon even further.

{¶ 29} "In my opinion, we are definitely making headway though slowly but surely. I feel additional laser treatments are in order in an effort to achieve the early goal and objective of having a maximally improved upper extremity skin and facial skin, so the patient feels better overall about her self-image. This would require pre-operative preparation, the surgical treatment as well as protection from the environment in terms of soil, etc. so that the healing process is not interfered with."

{¶ 30} The following day, a staff hearing officer affirmed the district hearing officer:

{¶ 31} "The injured worker was found to have reached maximum medical improvement * * *. The Staff Hearing Officer now finds no new or changed circumstances that would render the injured worker again temporarily and totally disabled due to the allowed conditions in this claim. The Staff Hearing Officer finds that the cosmetic surgical procedure that the injured worker underwent on 5/16/2005 is not a new and changed circumstance, or 'flare-up' in order to render the injured worker again temporarily and totally disabled.

{¶ 32} "All evidence was reviewed and considered, including the report of Dr. Aziz dated 9/08/2005. The staff hearing officer notes that the injured worker's current request is for temporary total disability compensation from 5/16/2005 to present, and to continue upon submission of medical evidence, and not merely a two week period of time in which the injured worker was bandaged due to the surgical cosmetic surgery."

{¶ 33} That order became final.

{¶ 34} Moore filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in refusing to

reinstate temporary total disability compensation. The court of appeals disagreed and denied the writ, prompting Moore's appeal as of right.

{¶ 35} When a claimant reaches maximum medical improvement, payment of temporary total disability compensation is barred. R.C. 4123.56(A). The commission's continuing jurisdiction, however, allows for reinstatement of temporary total disability compensation after an MMI determination if new and changed circumstances warrant. *State ex rel. Bing v. Indus. Comm.* (1991), 61 Ohio St.3d 424, 575 N.E.2d 177, syllabus. *Bing* held that the temporary "flare-up" or exacerbation of an allowed condition was a new and changed circumstance supporting renewed compensation. Id. at 427, 575 N.E.2d 177. This approach derives from recognition that "claimants who had previously been declared as MMI could experience temporary exacerbation of their condition that justified further treatment or even temporary total disability compensation as the claimant struggled to recover his or her previous level of well-being." *State ex rel. Conrad v. Indus. Comm.* (2000), 88 Ohio St.3d 413, 415–416, 727 N.E.2d 872.

{¶ 36} Moore argues that surgery can also constitute a new and changed circumstance, citing *State ex rel. Chrysler Corp. v. Indus. Comm.* (1998), 81 Ohio St.3d 158, 689 N.E.2d 951. In *Chrysler*, we did find that surgery could be a new and changed circumstance sufficient to reinstate temporary total disability compensation in an individual previously declared MMI. Id. at 169, 689 N.E.2d 951. We did not, however, state that surgery was automatically a new and changed circumstance. Equally important, *Chrysler* was followed by *State ex rel. Josephson v. Indus. Comm.,* 101 Ohio St.3d 195, 2004-Ohio-737, 803 N.E.2d 799, in which we held:

{¶ 37} "Unless there is a worsening of an allowed condition, a mere prospect of improvement beyond the level previously declared MMI will not justify a new recognition of temporary total disability.

{¶ 38} "* * * Absent a worsening of claimant's allowed condition, she is in effect saying no more than that the earlier declaration of MMI was premature." Id. at ¶ 17–18.

{¶ 39} There is no evidence that Moore's May 2005 laser treatment was precipitated by a worsening of her condition. To the contrary, Dr. Aziz explained in 2004 that treatment would consist of an ongoing series of these procedures. The record does suggest, however, that Moore's condition was temporarily worsened after the May 2005 procedure took place. The magistrate reports that Moore's face was covered in gauze for approximately two weeks after the procedure. The magistrate describes this fact as undisputed, and both the commission's brief and the September 9, 2005 staff hearing order mention it. The May 15, 2005 postoperative report and the postoperative photos support the fact that protective dressing was applied.

{¶ 40} In *Josephson*, we sought to establish a prerequisite that would help preserve the integrity of an MMI declaration. By requiring that a claimant's condition be exacerbated before temporary total disability compensation may resume, the *Josephson* standard reduces the incentive for claimants to return to the commission every time their doctors suggest that new or renewed treatment could generate improvement. But the instant case poses a question that we did not answer in *Josephson* : May benefits resume if the exacerbation follows, rather than precedes, treatment? The answer is yes. The commission is therefore ordered to determine whether Moore is entitled to any temporary total disability compensation due to postsurgical exacerbation.

{¶ 41} Accordingly, the judgment of the court of appeals is reversed, and the commission is ordered to consider the claim further and issue an amended order.

Judgment reversed
and limited writ granted.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Larrimer & Larrimer and Thomas L. Reitz, for appellant.

Vorys, Sater, Seymour & Pease, L.L.C., Joseph A. Brunetto, and Corrine S. Carman, for appellee International Truck & Engine.

Marc Dann, Attorney General, and Douglas R. Unver, Assistant Attorney General, for appellee Industrial Commission.