[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
{¶ 1} Relator, John A. Wheeler, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying compensation for temporary total disability ("TTD") compensation on reconsideration and to issue an order denying reconsideration.
 {¶ 2} The matter was referred to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate rendered a decision and recommendation, which included comprehensive findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate found that the commission had not abused its discretion in granting the request for reconsideration filed by the Ohio Bureau of Workers' Compensation. Having so found, the magistrate recommended that this court deny relator's request for a writ of mandamus. Relator has filed objections to the magistrate's decision.
 {¶ 3} Relator's objections to the contrary, this court finds that the magistrate properly discerned the pertinent legal issues and applied the relevant law to those issues. Having completed an independent review, this court finds no error in the magistrate's decision. Accordingly, this court hereby overrules relator's objections and adopts the magistrate's decision as its own, including the findings of fact and conclusions of law contained therein. As such, relator's request for a writ of mandamus is denied.
Objections overruled; writ denied.
BOWMAN and LAZARUS, JJ., concur.
 IN MANDAMUS {¶ 4} In this original action in mandamus, relator, John A. Wheeler, asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying compensation for temporary total disability ("TTD") on reconsideration and to issue an order denying reconsideration.
 {¶ 5} Findings of Fact:
 {¶ 6} 1. In 1995, John A. Wheeler ("claimant") sustained an industrial injury. His workers' compensation claim was allowed for lumbar sprain, disc displacement, and L5-S1 disc protrusion. The claim was also allowed for two psychological conditions, generalized anxiety and depressive disorder.
 {¶ 7} 2. On February 3, 1999, claimant's treating psychiatrist, Carmel Shaw-Nieves, M.D., reported that the allowed psychological conditions had reached maximum medical improvement ("MMI") as of December 18, 1998.
 {¶ 8} 3. Based on Dr. Shaw-Nieves' report, the Ohio Bureau of Workers' Compensation ("bureau") terminated TTD as of December 18, 1998.
 {¶ 9} 4. Thereafter, claimant received TTD based on his allowed physical conditions.
 {¶ 10} 5. On November 8, 2000, Dr. Shaw-Nieves submitted a report regarding the status of claimant's generalized anxiety disorder and depressive disorder. She listed claimant's medications, noted she saw him monthly, and described current symptoms.
 {¶ 11} 6. On July 10, 2001, claimant's treating physician, Robert R. Weiler, M.D., reported that claimant had reached MMI with regard to his allowed physical conditions.
 {¶ 12} 7. Based on Dr. Weiler's report, the bureau terminated TTD as of July 9, 2001. Claimant appealed.
 {¶ 13} 8. On August 10, 2001, Dr. Shaw-Nieves signed a C-84 form certifying TTD based on generalized anxiety disorder and depressive disorder. However, when asked for a return-to-work date, she did not provide one, stating instead that claimant was "disabled physically."
 {¶ 14} 9. In September 2001, the district hearing officer ("DHO") concluded that the physical conditions had reached MMI, based on Dr. Weiler's report. Accordingly, the DHO terminated TTD for those conditions. However, the DHO concluded that claimant was temporarily and totally disabled from the conditions identified by Dr. Shaw-Nieves in her reports of November 8, 2000, August 10, 2001, and August 14, 2001.[1]
 {¶ 15} 10. The bureau appealed.
 {¶ 16} 11. On October 10, 2001, Dr. Shaw-Nieves submitted a C-84 form certifying TTD based on generalized anxiety disorder and depressive disorder. In the space for providing a return-to-work date, Dr. Shaw-Nieves listed a date in January 2002, and added a note that claimant "is disabled."
 {¶ 17} 12. On October 16, 2001, a staff hearing officer ("SHO") affirmed the DHO order terminating TTD for the physical conditions based on Dr. Weiler's reports and awarding TTD for the psychological conditions based on the reports of Dr. Shaw-Nieves.
 {¶ 18} 13. On October 18, 2001, "Laurie D" at the bureau's service office contacted Dr. Shaw-Nieves' office and recorded the following notes:
 {¶ 19} "Phoned Dr. Shaws office spoke with Carolyn. . .
 {¶ 20} "Carolyn advises that Dr. Shaw states IW [injured worker] is disabled physically not psychologically.
 {¶ 21} "Requested Carolyn to advise Dr. Shaw that Mr. Wheeler has a Physician who treats the physical conditions of his claim whom renders a disability opinion in regard to such conditions. Carolyn was unaware he had a physician who treated only his physical conditions and again will advise Dr. Shaw.
 {¶ 22} "Carolyn further advises that Dr. Shaw indicated the treatment Mr. Wheeler is receiving is for maintenance purposes only.
 {¶ 23} "This IW was found MMI in 1998 for psychological dx and the opinion of Dr. Shaw has not changed — the C84 completed 10/10/01 was completed at request of IW Attorney.
 {¶ 24} "Carolyn will consult with Dr. Shaw again and will have a letter done clarifying the C84 dated 8/10/01 which indicates disabled physically and the C84 dated 10/10/01 which just indicates disabled."
 {¶ 25} 14. On October 25, 2001, Dr. Shaw-Nieves wrote a letter in response to the bureau's query, reiterating that claimant had reached MMI for the allowed psychological conditions in December 1998. She also stated her opinion that claimant had reached MMI for his physical disability as well.
 {¶ 26} 15. The bureau sent a questionnaire to Dr. Shaw-Nieves seeking to clarify her statements, posing several questions, including: (1) "Are you retracting your opinion of MMI (Maximum Medical Improvement) provided to the BWC of 12/17/98 in regard to the allowed `Psychological' conditions of this claim?" (2) "If you are not retracting your opinion of MMI of 12/17/98 for the psychological conditions of this claim, please provide BWC an explanation as to why you are completing the C84 Disability form for this IW?"
 {¶ 27} 16. On November 1, 2001, the bureau filed an appeal from the SHO order, filing additional evidence consisting of Dr. Shaw-Nieves' letter and the notes from the bureau's service office regarding its contact with Dr. Shaw-Nieves on October 18, 2001.
 {¶ 28} 17. On November 13, 2001, the bureau received (or at least completed imaging of) Dr. Shaw-Nieves' answers to the specific questions posed by the bureau. In response to the question, "Are you retracting your opinion of MMI (Maximum Medical Improvement) provided to the BWC of 12/17/98 in regard to the allowed `Psychological' conditions of this claim?" Dr. Shaw-Nieves answered, "No."
 {¶ 29} In response to the question, "If you are not retracting your opinion of MMI of 12/17/98 for the psychological conditions of this claim, please provide BWC an explanation as to why you are completing the C84 Disability form for this IW?" Dr. Shaw-Nieves answered:
 {¶ 30} "The patient's lawyer sent the form to us requesting it be completed. There are so many forms sent or needing completed for BWC-patient I often complete them w/o looking at the # of the form. This is why I have stopped taking new BWC patients. Too many forms."
 {¶ 31} Dr. Shaw-Nieves explained that claimant would not get any better and that the combination of physical and mental conditions rendered claimant unable to perform any sustained remunerative employment.
 {¶ 32} 18. The questionnaire described above indicates that it was initially sent by facsimile transmission on October 25, 2001, signed by Dr. Shaw-Nieves on Friday, November 9, 2001, and then sent again by facsimile transmission on Tuesday, November 13, 2001.
 {¶ 33} 19. On November 19, 2001, the bureau's appeal was refused.
 {¶ 34} 20. On December 6, 2001, the bureau filed an application for recon-sideration. In support, the bureau filed the statements made by Dr. Shaw-Nieves in response to the bureau's queries in October 2001 and November 2001.
 {¶ 35} 21. In January 2002, the commission reviewed the application for reconsideration and issued an interlocutory order that the bureau had presented sufficient evidence to warrant an evidentiary hearing.
 {¶ 36} 22. In May 2002, the commission heard the bureau's application for reconsideration and found that Dr. Shaw-Nieves' responses to the bureau's questions constituted new and changed circumstances. The commission concluded that this new evidence established that Dr. Shaw-Nieves had not changed her opinion, originally stated in February 1999, that the psychological conditions had reached MMI as of December 1998, and concluded that Dr. Shaw-Nieves did not reliably intend to certify a temporary psychological disability when she signed the C-84 forms presented to her in 2001. Because Dr. Weiler had certified that the physical conditions had reached MMI, and because Dr. Shaw-Nieves had not changed her opinion that the psychological conditions had reached MMI in December 1998, the commission terminated TTD as of the date of Dr. Weiler's report, as follows:
 {¶ 37} "* * * [N]ew and changed circumstances have occurred subsequent to the 10/16/2001 Staff Hearing Officer order and, accordingly, the exercise of continuing jurisdiction in this case is appropriate. Specifically, the Industrial Commission finds the 10/25/2001 and 11/09/2001 reports of Dr. Shaw-Nieves, the injured worker's treating psychiatrist, constitute newly discovered evidence. In her 10/25/2001 report, Dr. Shaw-Nieves indicates the allowed psychological conditions had reached maximum medical improvement as of 12/17/1998. In her 11/09/2001 report, Dr. Shaw-Nieves indicates by completing C-84 reports dated 08/10/2001 and 10/10/2001 she did not intend to retract her opinion that maximum medical improvement for the allowed psychological conditions had been reached as of 12/17/1998. The Industrial Commission finds these reports serve to repudiate Dr. Shaw-Nieves' earlier C-84 reports dated 08/10/2001 and 10/10/2001. * * * The Industrial Commission further finds the Administrator exercised due diligence in discovering and filing Dr. Shaw-Nieves' reports dated 10/25/2001 and 11/09/2001. The record reflects the Administrator first contacted Dr. Shaw-Nieves on 10/18/2001 to clarify discrepancies on her C-84 reports. This was only two days after the Administrator received the C-84 report dated 10/10/2001 which had been filed at the 10/16/2001 Staff Hearing Officer hearing. Dr. Shaw-Nieves' first C-84 report dated 08/10/2001 indicates that the injured worker is `disabled physically.' The C-84 report dated 10/10/2001 does not indicate the injured worker was `disabled physically' but, rather, merely states the injured worker is `disabled.' Given the discrepancy between these two C-84 reports, and the fact that the treating physician for the allowed physical conditions had previously indicated the injured worker had reached maximum medical improvement as of 07/10/2001, the Industrial Commission concludes that the Administrator acted with due diligence in first contacting Dr. Shaw-Nieves on 10/18/2001.
 {¶ 38} "* * *
 {¶ 39} "The Industrial Commission finds that the allowed physical conditions in this claim had reached maximum medical improvement as of 07/10/2001. This finding is based on Dr. Weiler's 07/10/2001 report. The Industrial Commission further finds that the allowed psychological conditions in this claim had reached maximum medical improvement as of 12/16/1998. Pursuant to a Bureau of Workers' Compensation order dated 02/01/1999, temporary total disability compensation for the allowed psychological conditions had been previously terminated on 12/16/1998 based on Dr. Shaw-Nieves' 01/13/1999 report. Based on Dr. Shaw-Nieves' 10/25/2001 and 11/09/2001 reports, the Industrial Commission finds that the allowed psychological conditions have remained at a level of maximum medical improvement since 12/16/1998. Furthermore, based on Dr. Shaw-Nieves' 10/25/2001 and 11/09/2001 reports, the Industrial Commission determines that the C-84 reports dated 08/10/2001 and 10/10/2001 from Dr. Shaw-Nieves are not persuasive evidence supporting payment of temporary total disability compensation based on either the allowed psychological or allowed physical conditions. Accordingly, the Industrial Commission vacates the 10/16/2001 Staff Hearing Officer order and reinstates the 07/18/2001 order of the Bureau of Workers' Compensation. The Industrial Commission orders that the injured worker's entitlement to temporary total disability compensation is terminated effective 07/09/2001. * * * "
 {¶ 40} Conclusions of Law:
 {¶ 41} In this mandamus action, claimant contends that the commission abused its discretion in exercising its continuing jurisdiction to reconsider a TTD award. Specifically, claimant contends that the commission violated Industrial Commission Resolution R98-1-03 in granting reconsideration in this case.
 {¶ 42} The magistrate notes first that, although the principles of res judicata are generally applicable in commission proceedings, the commission has continuing jurisdiction under R.C. 4123.52 to modify its final orders if it finds a mistake of fact or law in an order, fraud in obtaining an order, or it finds that new and changed circumstances have arisen. See, e.g., State ex rel. B C Machine Co. v. Indus. Comm. (1992), 65 Ohio St.3d 538. The authority in R.C. 4123.52 not only permits a reinstatement of TTD compensation after it has been terminated by commission order, but it also permits reconsideration of orders on administrative appeal. Both of these different applications of R.C. 4123.52
are involved in the present action, as explained more fully below.
 {¶ 43} First, it is undisputed the commission must terminate TTD compensation when the allowed condition for which TTD is being paid has reached MMI. See R.C. 4123.56(A). However, TTD for that condition may be reinstated under R.C. 4123.52 if circumstances change and claimant experiences a flare-up or relapse of the condition that again renders the claimant temporarily and totally disabled. State ex rel. Bing v. Indus. Comm. (1991), 61 Ohio St.3d 424 (relying on commission's continuing jurisdiction under R.C. 4123.52 to modify decisions when there are new and changed circumstances); State ex rel. Chrysler Corp. v. Indus. Comm. (1998), 81 Ohio St.3d 158 (noting that surgery can constitute new and changed circumstances that justify a reinstatement of TTD). In short, when there are new and changed circumstances under R.C. 4123.52, the commission may modify its final order finding MMI and may find that claimant is again temporarily and totally disabled.
 {¶ 44} However, when TTD has been terminated because the conditions for which it was being paid have reached MMI, the claimant may have another allowed condition, a different one, that has not yet reached MMI and is causing an inability to return to work, and TTD may be paid on the basis of the other allowed condition. See State ex rel. Basye v. Indus. Comm. (1992), 64 Ohio St.3d 68. For example, after TTD is terminated on the grounds that the physical conditions for which it was being paid have reached MMI, the claimant may obtain further TTD compensation on the basis of a psychological condition that has not reached MMI and that is preventing a return to work. Id. In that situation, principles of res judicata are not involved because there is no prior order terminating TTD for the psychological condition. Accordingly, in that situation, new and changed circumstances need not be shown under R.C. 4123.52. Id.
 {¶ 45} In the present action, TTD compensation had been terminated for the allowed psychological conditions as of December 18, 1998, based on Dr. Shaw-Nieves' report of February 1999 stating that the allowed psychological conditions had reached MMI. This termination of TTD for the psychological conditions is not challenged. Therefore, in order for TTD to be reinstated for the psychological conditions, claimant was required to demonstrate a relapse or flare-up of an allowed psychological condition that caused a temporary and total disability.
 {¶ 46} However, in this case, following termination of TTD for the psychological conditions in December 1998, claimant then received TTD for the physical conditions, an award that is not challenged in this action. Then, in July 2001, Dr. Weiler, the treating physician, reported that the physical conditions had reached MMI. The bureau and commission properly terminated TTD for the physical conditions, based on Dr. Weiler's report, and that termination is not challenged.
 {¶ 47} At issue are the following orders: the September 2001 order of the DHO, the October 2001 order of the SHO, the November 2001 order refusing further appeal (the "refusal order"), and the commission's order granting reconsideration and denying reinstatement of TTD for the psychological conditions. The magistrate addresses each of these four orders separately.
 {¶ 48} In the hearing before the DHO, claimant sought reinstatement of TTD for the psychological conditions, which had previously been terminated. As stated above, in order to have TTD reinstated for the psychological conditions, claimant had the burden of demonstrating new and changed circumstances with respect to those conditions since TTD was terminated for those conditions.
 {¶ 49} Claimant filed additional evidence prior to the DHO hearing, a C-84 report of August 10, 2001, in which Dr. Shaw-Nieves certified TTD based on the allowed psychological conditions (and also noted that claimant was "disabled physically"). The DHO awarded TTD based on the C-84 of August 2001 and two other medical reports.
 {¶ 50} The magistrate concludes that the DHO order was an abuse of discretion because none of the three reports cited in the order constituted "some evidence" to support a reinstatement of PTD for the psychological conditions. In the report of November 8, 2000, Dr. Shaw-Nieves briefly lists claimant's medications, frequency of appointments, and current symptoms. She does not describe the occurrence of any new and changed circumstances that would support a reinstatement of TTD for the psychological conditions. Likewise, the report of August 10, 2001 does not establish new and changed circumstances; nowhere in that report does Dr. Shaw-Nieves identify a material change in relator's psychological conditions since she found MMI. With respect to the August 14, 2001 report cited in the DHO order, the magistrate notes that the record includes no report of that date. (At oral argument, the parties confirmed that no report of that date is in the record.)
 {¶ 51} Further, the magistrate concludes that, not only did the DHO fail to cite "some evidence" to justify reinstating TTD for the psychological conditions, but the DHO also failed to comply with the principles set forth in State ex rel. Noll v. Indus. Comm. (1991),57 Ohio St.3d 203. In order to reinstate TTD based on the psychological conditions, the DHO had a duty to state that there were new and changed circumstances and to identify them. Here, the DHO made no mention of new and changed circumstances nor did the DHO cite evidence of such circumstances. Thus, the DHO order was defective as a matter of law.
 {¶ 52} On administrative appeal to the SHO, claimant filed an additional C-84 report from Dr. Shaw-Nieves, again certifying TTD based on the allowed psychological conditions. This report, like the August 2001 report, does not describe new and changed circumstances with respect to the psychological conditions. On October 16, 2001, however, the SHO explicitly affirmed the DHO order, reiterating briefly that the physical conditions had reached MMI based on Dr. Weiler's reports but that TTD could be paid for the psychological conditions based on the reports of Dr. Shaw-Nieves.
 {¶ 53} Once again, the hearing officer failed to identify new and changed circumstances that justified a reinstatement of TTD for the psychological conditions and failed to cite some evidence to establish new and changed circumstances. The SHO's affirmance with a vague reference to "the reports of Dr. Nieves" is not sufficient to support the award, because that reference encompasses a broad array of opinions, including her opinion that claimant's psychological conditions had reached MMI.
 {¶ 54} Thus, although both of the C-84 reports before the commission — the August 2001 report filed prior to the DHO hearing and the October 2001 report filed prior to the SHO hearing identified the allowed psychological conditions as the cause of TTD, neither report constituted "some evidence" upon which TTD could be reinstated for those conditions because neither report established new and changed circumstances. Accordingly, the SHO order of October 16, 2001 also constituted an abuse of discretion.
 {¶ 55} Following the SHO hearing, the bureau sought clarification from Dr. Shaw-Nieves regarding these C-84 reports, because she had certified TTD without explaining why she changed her opinion of MMI and why she appeared to be stating an opinion of physical disability. On October 18, 2001, a bureau employee obtained some information via telephone, and Dr. Shaw-Nieves sent a letter dated October 25, 2001, in which she reiterated that claimant had reached MMI for the allowed psychological conditions in December 1998. The bureau filed a timely appeal from the SHO order, submitting these documents.
 {¶ 56} However, in an appeal to the commission after the evidentiary hearings have closed, the commission has no duty to consider additional evidence that was filed after the evidentiary hearings ended. See State ex rel. Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693; State ex rel. Cordray v. Indus. Comm. (1990), 54 Ohio St.3d 99. Thus, in the present action, the person reviewing the SHO order was not obliged to review additional evidence filed after the SHO order was issued.
 {¶ 57} In the meantime, the bureau was continuing to obtain a clear explanation from Dr. Shaw-Nieves. On November 13, 2001, the questionnaire responses from Dr. Shaw-Nieves (which provide clear, signed statements on the crucial issues) were received by the bureau, but, on November 19, 2001, an SHO issued the refusal order. The order was a standard refusal order, consisting of a brief statement refusing further appeal with no statements of fact or law relating to the matter at issue.
 {¶ 58} The bureau then filed a request for reconsideration under Industrial Commission Resolution R98-1-03 ("the resolution"). In its request for reconsideration, the commission stated two grounds. First, the bureau asked for reconsideration based on the new evidence that it obtained after the evidentiary hearings had closed. Second, the bureau contended that the DHO and SHO had erred in reinstating TTD because the reports on which the hearing officers relied did not meet the applicable legal standards.
 {¶ 59} Under section (A) of the resolution, a request is timely if it is filed within 14 days from receipt of (1) an order issued by members of the commission, (2) a final order issued by an SHO, except for SHO orders under R.C. 4121.35(B)(2) and 4123.511(D), or (3) a refusal order. Under section (B) of the resolution, a request for reconsideration must be accompanied by copies "of the relevant orders of the Administrator and the Commission from which reconsideration is sought," a recitation of the specific grounds upon which reconsideration is sought, and copies of relevant documents and proof, and citations where appropriate.
 {¶ 60} There is no dispute that the bureau's request was timely because it was filed within 14 days of a refusal order, nor is there any claim that the bureau's request was unaccompanied by the required materials.
 {¶ 61} Section (C) of the resolution provides for service and responses, and section (D) addresses the commission's review of the request. Section (D) states that a request for reconsideration shall be considered only in the following cases:
 {¶ 62} "a. New and changed circumstances occurring subsequent to the date of the order from which reconsideration is sought. For example, there exists newly discovered evidence which by due diligence could not have been discovered and filed by the appellant prior to the date of the order from which reconsideration is sought. Newly discovered evidence shall be relevant to the issue in controversy but shall not be merely corroborative of evidence that was submitted prior to the date of the order from which reconsideration is sought.
 {¶ 63} "b. There is evidence of fraud in the claim.
 {¶ 64} "c. There is a clear mistake of fact in the order from which reconsideration is sought.
 {¶ 65} "d. The order from which reconsideration is sought contains a clear mistake of law of such character that remedial action would clearly follow.
 {¶ 66} "e. There is an error by the inferior administrative agent or subordinate hearing officer in the order from which reconsideration is sought which renders the order defective."
 {¶ 67} The magistrate concludes that the commission was within its discretion to find, under the resolution, that new and changed circumstances occurred subsequent to the date of the order from which reconsideration was sought. The commission found that the bureau acted with due diligence in obtaining the new evidence. Given the time sequences involved, the commission was within its discretion to find that the bureau acted with reasonable promptness in obtaining the evidence and seeking relief based on the new evidence. Further, as required under the resolution, the commission found that the new evidence — the October 18, 2001 contact notes, the letter from Dr. Shaw-Nieves, and the questionnaire responses — was relevant to the TTD issue in controversy. Given the content of these items of evidence, the magistrate concludes that the evidence was plainly relevant to period of TTD at issue, and the evidence served to clarify ambiguous statements by Dr. Shaw-Nieves, making clear that she had not intended to state in the C-84 reports that the allowed psychological conditions had not yet reached MMI. Accordingly, the magistrate finds no abuse of discretion in the commission's decision to grant the bureau's request for reconsideration.
 {¶ 68} Claimant argues, however, that when a party seeks reconsideration, the party may seek reconsideration of only one order, the final one in the administrative sequence of appeals. Accordingly, claimant argues that, for the commission to grant reconsideration, it had to find new and changed circumstances occurring subsequent to the "final order" rather than new and changed circumstances occurring subsequent to the order from which reconsideration was sought.
 {¶ 69} The magistrate disagrees. The language of the resolution makes clear that a party may seek reconsideration of any and all orders in the sequence. Section (B) of the resolution explicitly states that a request for reconsideration shall be accompanied by copies of "the relevant orders of the Administrator and the Commission from which reconsideration is sought." This language indicates that a party may seek reconsideration of multiple "orders," not only the refusal order, and that the commission may reconsider orders of the bureau and commission that precede the refusal order.
 {¶ 70} Section (A) deals only with how to measure the timeliness of the request, requiring that a party wait until there is a final order before seeking reconsideration. Section (A) does not limit which orders the commission may review but merely limits the time of filing. These sections, read together, show that a party must wait until all the appeals have been exhausted before seeking reconsideration, but that, once the final administrative appeal has been exhausted, the commission may review any of the orders of the bureau or commission that have been rendered in the matter. When section (A) is read in conjunction with the other sections, it is clear that section (A) focuses on when to file the request and does not bar a party from seeking reconsideration of the order at issue here, the SHO order. The resolution provides that, while a party must wait until the commission issues a final order before it can seek reconsideration of the relevant orders, there can be more than one relevant order from which reconsideration is sought.
 {¶ 71} This interpretation of the commission's resolution is the interpretation that the commission has adopted, and its interpretation of its resolution is reasonable. Accordingly, the magistrate rejects the argument that, on reconsideration, the commission could review only the refusal order as the order "from which reconsideration is sought." The magistrate rejects the argument that, to meet the resolution's criterion, the commission was obliged to cite new and changed circumstances that occurred after the "final order." The resolution simply does not say that new and changed circumstances must have occurred after the final administrative order. On the contrary, the resolution expressly refers in section (B)(2) to the "orders * * * from which reconsideration is sought" and states in section (D)(1)(a) that there must be new and changed circumstances occurring subsequent to "the order from which reconsideration is sought." The bureau sought reconsideration of the SHO order, and the commission was within the boundaries of its resolution to consider whether new and changed circumstances occurred after the SHO order.
 {¶ 72} Claimant raises the argument that, when the commission issued its refusal order on November 20, 2001, the new evidence was already in the bureau's file at that time, and that the refusal order therefore constituted a final adjudication that the new evidence was insufficient to reverse the SHO's order. Claimant then argues that, given the lack of new and changed circumstances following the refusal order, the commission had no power to revisit the determination made in the refusal order.
 {¶ 73} The magistrate disagrees. In the refusal order, the commission did not specifically address the issues or the evidence. No findings were made. Moreover, in issuing the refusal order, the commission had no duty to consider the new evidence that was filed after the SHO order. At the first level of appeal to the DHO, and at the second level of appeal to the SHO, new evidence must be reviewed by the hearing officer, but new evidence filed after the close of the evidentiary hearings need not be considered at the third and final level of administrative appeal. See, generally, Domjancic; Cordray, supra. Consequently, the refusal order need not be considered as a conclusive and binding determination as to the relevance or weight of the newly filed evidence. Rather, the commission was entitled to compare the evidence on file at the close of the final evidentiary hearing (the SHO hearing) with the new evidence filed subsequent to the SHO order in determining whether there were new and changed circumstances. Accordingly, the commission acted within the law in granting reconsideration.
 {¶ 74} In sum, the commission did not violate the resolution on reconsideration when it reviewed the SHO order and focused on whether new and changed circumstances occurred after the SHO decision was rendered. Furthermore, the orders of the DHO and SHO were defective regardless of the additional statements and response received from Dr. Shaw-Nieves, as the hearing officers did not cite some evidence to support the award and failed to provide an adequate statement of the rationale. The commission had failed to recognize those errors in the final level of administrative appeal, when it should have granted the appeal regardless of whether or not it reviewed the newly filed evidence. The DHO and SHO orders were defective on their faces as soon as they were issued, and the new evidence simply showed more obvious and clear-cut defects.
 {¶ 75} The magistrate, therefore, concludes that claimant has not met his burden of proof in mandamus and that the court should deny the requested writ.
[1] Note: The record includes no report dated August 14, 2001.