DECISION
{¶ 1} Relator, Jeffrey Barnes, seeks a writ of mandamus that directs respondent Industrial Commission of Ohio ("commission") to vacate its order that denied him temporary total disability ("TTD") compensation, effective April 20, 2004, and that directs the commission to award TTD compensation, effective April 20, 2004. In the alternative, relator's complaint seeks a writ of mandamus that directs the commission to vacate its order denying TTD compensation, effective April 20, 2004, and that directs the commission to conduct a new hearing concerning relator's entitlement to TTD compensation. The commission previously found that relator's industrial injury had reached maximum medical improvement ("MMI") as of July 22, 2002.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court. The magistrate examined the evidence and issued a decision wherein he made findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate concluded that relator could not show that the commission abused its discretion by denying TTD compensation, and the magistrate recommended denial of relator's request for a writ of mandamus.
 {¶ 3} Relator has filed objections to the magistrate's decision. In his objections, relator asserts:
The Magistrate Erred by Concluding That the Challenged Orders of Respondent, Industrial Commission of Ohio, Constituted the Only Evidence of What Arguments Relator, Jeffrey Barnes, Made Administratively in Seeking a New Period of Temporary Total Disability Following a Surgical Procedure and a Flare-Up of His Allowed Conditions.
 {¶ 4} To be entitled to a writ of mandamus, relator must show (1) a clear legal right to the relief requested; (2) respondent is under a clear legal duty to perform the act sought; and (3) relator has no plain and adequate remedy at law. State ex rel.Fain v. Summit Cty. Adult Probation Dept. (1995),71 Ohio St.3d 658, citing State ex. Howard v. Ferreri (1994),70 Ohio St.3d 587, 589.
 {¶ 5} "`[D]etermination of disputed factual situations is within the final jurisdiction of the Industrial Commission, and subject to correction by action in mandamus only upon a showing of abuse of discretion.'" State ex rel. Morris v. Indus. Comm.of Ohio (1984), 14 Ohio St.3d 38, 39, quoting State ex rel.Haines v. Indus. Comm. (1972), 29 Ohio St.2d 15, 16; State exrel. Posey v. Indus. Comm. (1984), 12 Ohio St.3d 298, 299. An abuse of discretion occurs "where there is no evidence upon which the commission could have based its factual conclusion." Stateex rel. Morris, supra, at 39, citing State ex rel. Posey,
supra; State ex rel. Questor Corp. Indus. Comm. (1982),70 Ohio St.2d 240, 241, citing State ex rel. Teece v. Indus. Comm.
(1981), 68 Ohio St.2d 165. "`Where a commission order is adequately explained and based on some evidence, evidence that may be persuasively contradicted by other evidence of record, the order will not be disturbed as manifesting an abuse of discretion.'" State ex rel. Avalon Precision Casting Co. v.Indus. Comm., 109 Ohio St.3d 237, 2006-Ohio-2287, at ¶ 9, quoting State ex rel. Mobley v. Indus. Comm. (1997),78 Ohio St.3d 579, 584.
 {¶ 6} Here, relator asserts that the magistrate erred by concluding that the commission's orders constituted the only evidence of relator's arguments before the commission in support of his application for TTD compensation. In his decision, the magistrate stated:
[R]elator argues that the commission abused its discretion by failing to address two theories that relator puts forth in support of reinstatement of TTD compensation. The first theory is that the PLDD procedure itself, performed on November 4, 2003, constitutes a new and changed circumstance. The second theory claims that relator experienced a flare-up or worsening of his condition in April 2004 when he fell and sought emergency room treatment.
(Magistrate's Decision, at 12.)
 {¶ 7} The magistrate further stated:
A review of the DHO's order of September 10, 2004 and the SHO's order of November 4, 2004, that affirmed the DHO's order, discloses, as relator points out, that the commission did not address the two theories that relator posits here. However, that does not automatically indicate that the commission abused its discretion in failing to adjudicate those two theories.
Here, relator does not actually claim that he presented those two theories at the administrative proceedings. He simply claims that the commission failed to address those theories. Moreover, there is no evidence in the record indicating that relator presented those two theories to the commission for adjudication.
The orders of the DHO and SHO themselves are the only evidence in the record as to what relator actually argued administratively.
(Magistrate's Decision, at 13.)
 {¶ 8} Relator asserts, among other things, that the magistrate's finding is factually inaccurate. According to relator, C-84 forms in the record reference (1) an IDET annuloplasty that relator underwent in November 2003; (2) a requested post-IDET physical medicine program; and (3) a postoperative visit after IDET treatment. Relator also cites to correspondence between Dr. Dixon and Dr. May wherein a recurrence of back pain is noted.
 {¶ 9} Notwithstanding relator's objections, although evidence in the record may be supportive of relator's theories if these theories were indeed presented to the commission, there is no evidence in this record that relator actually advanced these theories before the commission. Copies of documents in the stipulated evidence that mention a recurrence of a condition and medical intervention are not necessarily probative as to whether relator actually advanced theories before the commission. Furthermore, we cannot conclude that the magistrate erred when he concluded in this case that "[t]he orders of the DHO and SHO themselves are the only evidence in the record as to what relator actually argued administratively." (Magistrate's Decision, at 13.) See, e.g., State ex rel. Yellow Freight System, Inc. v.Indus. Comm. (1994), 71 Ohio St.3d 139, 142 (stating that "[t]he commission speaks only through its final actions, i.e., its orders" and "[c]onsistent with this tenet, evidentiary review is limited to the evidence and reasoning identified in the order").
 {¶ 10} Therefore, absent any evidence in the record that relator actually advanced relator's theories before the commission, we conclude that the magistrate did not err in his conclusion of law.
 {¶ 11} Accordingly, for the foregoing reasons, we hold that the magistrate has properly discerned pertinent facts and properly applied the relevant law to those facts. Therefore, we overrule relator's objections to the magistrate's decision.
 {¶ 12} Furthermore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, except for the magistrate's number 22 finding of fact. In his number 22 finding of fact, the magistrate found that on August 18, 2004, Dr. May requested authorization for a repeat diskogram and certified TTD to an estimated return-to-work date of November 18, 2004. Rather, according to the stipulated evidence, on August 19, 2004, Dr. May appears to request authorization for another diskogram, and Dr. May certified TTD to an estimated return-to-work date of November 19, 2004. See, generally, Civ.R. 53(E)(4)(b) (providing that a court shall rule on any objections to a magistrate's decision and a court may adopt, reject, or modify a magistrate's decision).
 {¶ 13} Accordingly, having adopted the magistrate's decision as our own with the exception of the magistrate's number 22 finding of fact, and having overruled relator's objections, we therefore deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
Klatt, P.J., and McGrath, J., concur.
 (APPENDIX A) IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Jeffrey Barnes, : Relator, : :
v. : No. 05AP-298 :
Industrial Commission of Ohio : and Three Little Pigs, Ltd., : :
: Respondents. : :
:
 MAGISTRATE'S DECISION Rendered on October 27, 2005 Philip J. Fulton Law Office, and Jacob Dobres, for relator.
Jim Petro, Attorney General, and Dennis L. Hufstader, for respondent Industrial Commission of Ohio.
Elliott P. Geller, for respondent Three Little Pigs, Ltd.
 IN MANDAMUS {¶ 14} In this original action, relator, Jeffrey Barnes, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation beginning April 20, 2004, and to enter an order awarding TTD compensation beginning April 20, 2004. In a previous order, the commission had determined that the industrial injury had reached maximum medical improvement ("MMI") as of July 22, 2002.
Findings of Fact:
 {¶ 15} 1. On May 26, 2000, relator sustained an industrial injury while employed as a dishwasher for respondent Three Little Pigs, Ltd., dba "Hoggy's." On that date, relator injured his lower back when he lifted a trash can. The industrial claim is allowed for "sprain lumbosacral; lumbar/lumbosacral disc degenerative; L5-S1 protruding disc," and is assigned claim number 00-419338.
 {¶ 16} 2. On January 17, 2002, relator was examined, at the employer's request, by Gordon Zellers, M.D. In a report dated February 12, 2002, Dr. Zellers states:
* * * [D]espite one endoscopic procedure, extensive physical rehabilitation and appropriate pharmacologic therapy, Mr. Barnes remains symptomatic with lumbosacral spine radicular complaints. He presents with a variety of subjective limitations and his physical examination is consistent with his historical presentation.
* * * I am of the opinion that his treatment to date has been both appropriate and medically necessary. Most recently, the patient reports that his treating physician has suggested that he undergo a series of three epidural steroid injections. In my opinion, there is reasonable potential for medical improve-ment as a direct result of this treatment approach. In light of the patient's potential for further medical improvement, his claim allowances have not met the definition of having reached a level of maximum medical improvement.
It bears emphasizing, however, that if for any reason this patient fails to undergo the epidural steroid injection series made reference to above, then his industrial claim allowances should all immediately be categorized as having reached a level of maximum medical improvement as he has already exhausted all other reasonable nonsurgical therapeutic mo-dalities and his previous diagnostic procedures have failed to identify the presence of a surgically correctable lesion.
* * *
* * * I am of the opinion that he is currently unable to resume his original full-time, full duty labor activities as a dishwasher as he would be unable to tolerate the heavy lifting activities required of him by that occupation. * * *
 {¶ 17} 3. In February 2002, Edwin H. Season, M.D., who had examined relator on October 30, 2001, was asked whether relator was at MMI. In an addendum to his report, Dr. Season wrote:
Mr. Barnes is a candidate for rehabilitation and work hardening. If he has not undergone rehab and work hardening such a program should be implemented. He will not reach MMI until such a program is completed. If the rehab program was completed or he refused or was not qualified for such a program (as of 10-30-01) then I believe he reached MMI as of 10-30-01.
 {¶ 18} 4. On March 18, 2002, the employer moved to terminate TTD com-pensation.
 {¶ 19} 5. Following a May 31, 2002 hearing, a district hearing officer ("DHO") issued an order terminating TTD compensation as of the hearing date. The DHO's order explains:
The District Hearing Officer finds that Mr. Barnes is no longer entitled to temporary total disability compensation and such is terminated on today's date, 05/31/2002. This decision is based upon the examination and addendum from Dr. Season and the 02/12/2002 examination by Zellers. Dr. Season indicated that Mr. Barnes would reach maximum medical improvement if he did not undergo rehabilitation or work hardening. Dr. Zellers opined that Mr. Barnes would reach maximum medical improvement if he did not undergo epidural injections. Although epidural injections were approved for the period of 11/06/2001 to 01/31/2002 and were extended for approval through 03/08/2002, to date epidurals have not been undertaken. From the testimony provided at the hearing, it appears that Dr. Fleming requested authorization for epidurals but was not qualified to perform same. Instead, Mr. Barnes is scheduled for a consultation in June with a pain specialist and it is presumed that this specialist will recommend and perform the epidural injections. From 11/2001 to today's date, Mr. Barnes' treatment has consisted of monthly office visits for medication management. As stated above, he has not undergone any epidural injections and has not initiated a rehabilitation or work hardening program. As such, the District Hearing Officer finds that the allowed conditions have reached maximum medical improvement and that temporary total disability compensation is no longer payable.
 {¶ 20} 6. Relator administratively appealed the DHO's order of May 31, 2002.
 {¶ 21} 7. Following a July 22, 2002 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order. The SHO's order explains:
* * * [T]emporary total disability compensation must properly be terminated as of the date of the district hearing, 05/30/2002 [sic]. This finding was made in reliance upon the 02/12/2002 report of Dr. Zellers and the examination and addendum reports from Dr. Season. The Staff Hearing [O]fficer has considered the claimant's argument that both of those reports were conditioned upon the claimant not undergoing specific named further treatment. In light of the fact that the claimant has not undergone either the epidural injections or the rehabilitation and work hardening programs discussed in the those [sic] two reports, not withstanding [sic] the past significant amount of time, the Staff Hearing Officer finds that these reports plainly and properly support the finding of maximum medical improvement, and constitute the weight of the evidence. It is particularly noteworthy that although epidural injections were approved as long ago as 11/06/2001, they have not yet been done.
 {¶ 22} 8. On August 7, 2002, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of July 22, 2002.
 {¶ 23} 9. On March 12, 2003, relator was examined by Charles B. May, D.O. Apparently summarizing records that he had reviewed, Dr. May wrote: "He was then referred to Dr. Fitz, another pain management specialist, and underwent two series of three injections which sounded like lumbar epidural steroid injections although may have been facet injections."
 {¶ 24} 10. Based on his March 12, 2003 examination, Dr. May requested a neurosurgical consultation. A consult with neurosurgeon Robert A. Dixon, D.O., was approved.
 {¶ 25} 11. On June 23, 2003, Dr. Dixon performed a lumbar diskogram.
 {¶ 26} 12. In an August 27, 2003 letter to Dr. May, Dr. Dixon wrote:
I re-evaluated Jeff Barnes after completion of the lumbar discogram at L4-5, L5-S1. This was completed on 6/23/03 * * *. He had a normal injection at L4-5 which was non-painful and had essentially a normal nuclear pattern. L5-S1 had 50% loss of disc height, Grade II tearing, and concordant pain quality reproducible on two separate injections. The patient has low back pain with some pain radiating into his right posterior thigh. His chief complaint is of lumbosacral junction pain. He has not improved with multiple measures including physical therapy and epidural injections. He describes sitting intolerance. He is not interested in pursuing a surgical treatment. For this reason, I have discussed with him PLDD. His MRI study from 8/11/00 shows a central and to the right disc protrusion at L5-S1 in this patient with right posterior thigh pain and a preponderance of lumbosacral pain. I reviewed with him operative and nonoperative treatment options including PLDD vs. lumbosacral fusion. Risks, benefits, and limitations of the procedure including my rationale for recommending it were discussed. He seems to understand the above well and requests we proceed with surgery at the earliest possible date as he is interested in returning to gainful employment. * * *
 {¶ 27} 13. In an October 15, 2003 letter to Dr. May, Dr. Dixon wrote:
I re-evaluated Jeff Barnes and reviewed with him my previous recommendations for PLDD. My rationale for recommending this as opposed to a more extensive lumbar fusion were discussed with him. Details of the procedure including risks, benefits, and limitations of the procedure, my operative experience, and usual post-operative course were discussed with him as well. We have scheduled him for this outpatient procedure on November 4, 2003[.] * * *
 {¶ 28} 14. On a C-84 dated December 9, 2003, Dr. May certified a period of TTD beginning June 23, 2003 to an estimated return-to-work date of February 5, 2004. On the C-84, Dr. May indicated that the industrial injury is not at MMI.
 {¶ 29} 15. In a December 31, 2003 letter to Dr. May, Dr. Dixon wrote:
I re-evaluated Jeff Barnes for his first post-op visit following IDET annuloplasty completed on 11/4/03. He continues to have some lateral thigh numbness which comes and goes on the right. He is, however, completely off of all narcotic pain medication. He has had an excellent response to the PLDD. In light of his excellent response, I discussed with him ad-vancement into a physical medicine rehab program. I recommended that he complete a six week program to in-clude dynamic stabilization exercises. I have also recom-mended he change jobs to one which does not require heavy lifting, bending, or twisting. He is currently undergoing education for data entry to change to this type of job. I have given him a return to work date of 2/4/04. He will follow-up with you for consideration of physical medicine. * * *
 {¶ 30} 16. On a C-84 dated February 3, 2004, Dr. May extended TTD through an estimated return-to-work date of May 3, 2004.
 {¶ 31} 17. On April 28, 2004, Dr. May wrote:
Jeff Barnes was reexamined in the office on 04/28/04 in regards to the above captioned claim. As you know, he is in a job search program, apparently as of 04/26/04. Mr. Barnes states that while in the course of job search, his right leg radicular symptoms began to exacerbate, and his right leg buckled, causing him to fall. He now has more severe low back pain, mainly on the right side.
On physical examination, there is markedly restricted range of motion in the lumbar spine due to pain and spasm. Straight leg raising test is negative for sciatic tension. Deep tendon reflexes are intact.
I did perform x-rays of the lumbar spine in the office. There was no evidence of acute traumatic osseous pathology.
This is not the first time his right leg has given out. I would like to have him reevaluated by his neurosurgeon, Dr. Dixon, as he may need additional treatment for his L5-S1 disc. * * *
 {¶ 32} 18. On Thursday, April 29, 2004, relator presented to the Mount Carmel East Emergency Room. After X-rays of the lumbar spine were taken and evaluated, relator was released with a prescription for pain medication (Lortab). The emergency room notes state: "[Patient] States this past [Tuesday] was was [sic] walking and right leg buckled under him which has caused recurrent pain in low back. [Patient] states he took [A]dvil with no releif [sic]."
 {¶ 33} 19. On May 11, 2004, Dr. Dixon wrote to Dr. May:
I re-evaluated Jeff Barnes who, as you recall, previously underwent a PLDD at L5-S1 for a herniated disc with low back pain on 11/4/03. He did very well following the annulo-plasty procedure up until two weeks ago when he had recurrence of back pain. He localizes his back pain to the right mid-lumbar paraspinous area, right iliosacral groove, and right sacroiliac joint.
He describes his symptoms onsetting when he got out of a car. He took three steps and his right leg locked up on him. He states it felt like his kneecap was dislocated and he fell to the ground.
He had just finished PT two weeks prior to that.
He had been completely off of all narcotic pain medication but had not yet returned to work. He relates that his pain symptoms have improved somewhat more recently.
PHYSICAL EXAMINATION: On physical examination, extension and forward flexion equally aggravate his back pain. He ambulates without antalgia. He transfers easily. Straight leg raising produces hip and leg discomfort at 80 degrees as does hip external rotation. He has palpable tenderness along the sacroiliac joints with a triggerpoint elicited in this area, as well as, the iliosacral groove.
IMPRESSIONS:
1. Recurrent low back pain of two weeks duration with intermittent radicular symptoms, right leg, rule out possible recurrent disc herniation (722.2)[.]
RECOMMENDATIONS: In that his symptoms have improved somewhat recently and have only been present for two weeks, I have recommended that he follow-up with you for a retry of conservative treatment including physical medicine and triggerpoint injections. I have written him a prescription of 50 Vicodin with 1 refill and have also written him a prescrip-tion for an MRI study of his lumbar spine. If physical medicine and rehab treatments do not provide him improvement after three weeks, he should undergo an MRI study of his lumbar spine and I will need to see him back in follow-up for a follow-up visit. He will follow-up with you for consideration of a re-try of conservative treatment. I will see Jeff back if he fails to improve with the above measures. I appreciate participating in his care.
 {¶ 34} 20. On a C-84 dated June 8, 2004, Dr. May extended TTD to an estimated return-to-work date of September 8, 2004.
 {¶ 35} 21. On June 8, 2004, Dr. Dixon wrote to Dr. May:
Jeff had an excellent response to a PLDD. He had recurrence of back pain, however, while doing physical therapy. I have reviewed the MRI films with him. There are no acute changes. At this point in time, I recommend he re-pursue conservative treatment including triggerpoint injec-tions, or epidural/facet injections, with physical medicine. He will follow-up with you for consideration of the above. He understands that should his symptoms persist despite the above measures, I would need to repeat his discogram study (prior study 6/23/03) to evaluate him for possible fusion. * * *
 {¶ 36} 22. On August 18, 2004, Dr. May requested authorization for a repeat diskogram and certified TTD to an estimated return-to-work date of November 18, 2004.
 {¶ 37} 23. Earlier, on August 3, 2004, the Ohio Bureau of Workers' Compensation ("bureau") referred the issue of further TTD compensation to the commission for adjudication.
 {¶ 38} 24. Following a September 10, 2004 hearing, a DHO issued an order stating:
Temporary total compensation is denied from 04/20/2004 through today 09/10/2004. Temporary total compensation was terminated by the orders of 05/31/2002 and 07/22/2002 on the basis of maximum medical improvement. Both orders listed the lack of treatment as a factor. Epidural injection had been authorized, but the injured worker did not undergo such in 2002. In 2003 treatment became more active. However, the hearing officer does not feel that the renewed treatment changes the status of the injured worker's extent of disability as found by the 05/31/2002 and 07/22/2002 orders.
 {¶ 39} 25. Relator administratively appealed the DHO's order of September 10, 2004.
 {¶ 40} 26. Following a November 4, 2004 hearing, an SHO issued an order affirming the DHO's order of September 10, 2004. The SHO's order explains:
Temporary total disability compensation is denied for the requested new period of 04/20/2004 through 09/10/2004 and to continue. The Staff Hearing Officer affirms the finding of the District Hearing Officer that there are no new and changed circumstances since the previous finding of the Staff Hearing Officer on 07/22/2002 that the injured worker has reached maximum medical improvement. The injured worker argues that since that finding of maximum medical improvement on 07/22/2002, the injured worker has undergone epidural injections and has been enrolled in vocational rehabilitation. However, the Staff Hearing Officer is not persuaded by this argument. The Staff Hearing Officer order of 07/22/2002 indicates that the epidural injections had been approved prior to his finding of maximum medical improvement, but that the injured worker had yet to undergo those epidural injections as of 07/22/2002. That order terminating temporary total com-pensation for the reason of maximum medical improvement also indicated that rehabilitation had been recommended, but that the injured worker had not yet undergone these services. The fact that the injured worker later undergoes the recom-mended treatment does not persuade the Staff Hearing Officer today that the injured worker has again become temporarily and totally disabled.
 {¶ 41} 27. On December 8, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 4, 2004.
 {¶ 42} 28. On March 24, 2005, relator, Jeffrey Barnes, filed this mandamus action.
Conclusions of Law:
 {¶ 43} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 44} This case involves the question of under what circumstances the commission can reinstate TTD compensation following an earlier finding that the industrial injury has reached MMI.
 {¶ 45} The Supreme Court of Ohio had occasion to succinctly summarize the law pertinent to that question in State ex rel.Josephson v. Indus. Comm., 101 Ohio St.3d 195, 2004-Ohio-737:
* * * [I]n [State ex rel. Bing v. Indus. Comm. (1991),61 Ohio St.3d 424], the claimant's condition temporarily worsened after MMI had been declared. We renewed TTC, reasoning that during the flare-up, claimant was not at MMI, and until she regained that level, she should be compensated with TTC.
We reached the same result in State ex rel. Conrad v. Indus.Comm. (2000), 88 Ohio St.3d 413, * * * and State ex rel. ValueCity Dept. Stores v. Indus. Comm., 97 Ohio St.3d 187,2002-Ohio-5810 * * *. Conrad described Bing as "recogniz-[ing] that claimants who had previously been declared as MMI could experience temporary exacerbation of their condition that justified further treatment or even temporary total disability compensation, as the claimant struggled to recover his or her previous level of well-being." 88 Ohio St.3d at 415-416 * * *. Similarly, the claimant in Value City experienced a medical deterioration when the leads on her injury-related nerve stimulator failed. This worsening, combined with the favorable prognosis for improvement once those leads were replaced, was enough to resume TTC despite an earlier declaration of MMI.
These cases establish that, to date, the only new and changed circumstance sufficient to re-entitle a worker to TTC is the worsening of the claimant's allowed conditions accompanied by a prognosis that the worsening is only temporary. * * *
Id. at ¶ 14-16.
 {¶ 46} A claimant's need for surgery, under some circumstances, can constitute a new and changed circumstance that justifies reinstatement of TTD compensation. See State ex rel.Chrysler Corp. v. Indus. Comm. (1998), 81 Ohio St.3d 158, 169
(claimant's need for knee replacement surgery where the claim is allowed for various knee conditions).
 {¶ 47} In State ex rel. Wilson v. Indus. Comm., Franklin App. No. 04AP-577, 2005-Ohio-1528, this court recently denied a writ of mandamus. In Wilson, the commission reinstated TTD compensation from the date of an "IDET" procedure that Laura Wilson underwent. However, the commission denied TTD compensation for the period im-mediately prior to the IDET procedure.
 {¶ 48} In Wilson, this court held that the commission did not abuse it's discretion in denying TTD compensation for the period prior to the IDET procedure because there was no evidence that the allowed condition had worsened during the period. Thus, without a change in the underlying medical condition, there was not a new and changed circumstance that could support reinstatement of TTD. Id.
 {¶ 49} It is important to note that, in Wilson, the commission's award of TTD compensation starting with the date of the IDET procedure was not at issue. Contrary to what relator suggests here, in Wilson, this court did not approve the commission's granting of TTD compensation. (See Relator's reply brief, at 4.) Moreover, relator is incorrect in asserting that the Wilson case establishes "that PLDD or IDET is a surgical procedure sufficient to reinstate TTD compensation." (Relator's brief, at 9.)
 {¶ 50} Clearly, Wilson does not stand for the proposition that undergoing a so-called PLDD or IDET procedure automatically reinstates TTD compensation for any claimant whose industrial injury had previously been found to have reached MMI.
 {¶ 51} Here, relator argues that the commission abused its discretion by failing to address two theories that relator puts forth in support of reinstatement of TTD compensation. The first theory is that the PLDD procedure itself, performed on November 4, 2003, constitutes a new and changed circumstance. The second theory claims that relator experienced a flare-up or worsening of his condition in April 2004 when he fell and sought emergency room treatment.
 {¶ 52} Relator argues:
Despite the two distinct new and changed circumstances — the PLDD and a documented flare-up of the allowed conditions requiring extensive treatment — the Commission simply found that Mr. Barnes's undergoing ESIs [epidural steroid injections] and enrolling in vocational rehabilitation were insufficient to reinstate TTD compensation from April 20, 2004 to September 10, 2004. While Mr. Barnes's failure to undergo ESIs or vocational rehabilitation ultimately led to the MMI finding in 2002, the Commission's focus on these two items in determining whether to reinstate TTD compensation entirely missed the mark. Rather than consider that Mr. Barnes ultimately did undergo ESIs and enroll in vocational re-habilitation, the Commission should have determined whether a) the PLDD and/or b) the flare-up rendered Mr. Barnes TTD once again. The Commission abused its discretion by failing to properly explain whether the PLDD on November 4, 2003 and/or the documented flare up in April 2004 (the starting point for the denied period of TTD compensation) supported a new period of TTD compensation. Accordingly, a writ of mandamus should issue.
(Relator's brief, at 10.)
 {¶ 53} A review of the DHO's order of September 10, 2004 and the SHO's order of November 4, 2004, that affirmed the DHO's order, discloses, as relator points out, that the commission did not address the two theories that relator posits here. However, that does not automatically indicate that the commission abused its discretion in failing to adjudicate those two theories.
 {¶ 54} Here, relator does not actually claim that he presented those two theories at the administrative proceedings. He simply claims that the commission failed to address those theories. Moreover, there is no evidence in the record indicating that relator presented those two theories to the commission for adjudication.
 {¶ 55} The orders of the DHO and SHO themselves are the only evidence in the record as to what relator actually argued administratively.
The DHO's order states in part:
* * * In 2003 treatment became more active. However, the hearing officer does not feel that the renewed treatment changes the status of the injured worker's extent of disability as found by the 05/31/2002 and 07/22/2002 orders.
The SHO's order states in part:
* * * The injured worker argues that since that finding of maximum medical improvement on 07/22/2002, the injured worker has undergone epidural injections and has been enrolled in vocational rehabilitation. * * * The fact that the injured worker later undergoes the recommended treatment does not persuade the Staff Hearing Officer today that the injured worker has again become temporarily and totally disabled.
 {¶ 56} The orders do not indicate that relator presented either of the theories he presents here. Nor is there any other evidence in the record indicating that relator presented either of the theories he presents here.
 {¶ 57} The commission had no duty to comb through the various medical reports of record in search of theories that might support reinstatement of TTD and then address those theories in its order. It was relator's responsibility to present his theory or theories supporting a claim of reinstatement of TTD compensation. See State ex rel. Quarto Mining Co. v. Foreman
(1997), 79 Ohio St.3d 78, 81-84.
 {¶ 58} Because relator fails here to show that he raised either of his two theories for reinstatement of TTD administratively, he cannot show that the commission abused its discretion in failing to address either of those theories in its orders.
 {¶ 59} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.